No. 24-70006

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

Brian Edward Davis,
*Movant*

v.

Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional
Institutions Division,
*Respondent.*

_____

On Motion for Certificate of Appealability from
the United States District Court
for the Southern District of Texas

_____

## MOTION FOR CERTIFICATE OF APPEALABILITY
## AND BRIEF IN SUPPORT

Kenneth W. McGuire
Federal Admission No. 21917
State Bar No. 00798361
P.O. Box 79535
Houston, TX 77279
Telephone: (713) 223-1558
Facsimile: (713) 335-3340

*Counsel for Brian Edward Davis*

**\*\*CAPITAL CASE\*\***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT ............................................................................................. 1

STATEMENT OF THE CASE ......................................................................... 2

ARGUMENT ................................................................................................... 6

I.     STANDARD FOR CERTIFYING APPEAL ............................................ 6

II.    REASONABLE JURISTS COULD DEBATE WHETHER MR. DAVIS' RIGHTS UNDER BRADY V. MARYLAND WERE VIOLATED BY THE STATE NOT DISCLOSING THAT PRIME SUSPECT TINA MCDONALD HAD BEEN INVOLVED IN PRIOR VIOLENT CRIMES INVOLVING HER SKINHEAD GROUP NSSH ("NATIONAL SOCIALIST SKINHEADS OF HOUSTON"), WHOSE INITIALS WERE FOUND SCRAWLED ACROSS DECEDENT FOSTER'S WALL AT THE CRIME SCENE, AND WHETHER SUCH SUPPRESSION MATERIALLY AFFECTED THE OUTCOME OF MR. DAVIS' 1992 G/I CAPITAL TRIAL. ……………………………………………………..8

    A. Reasonable jurists could debate the District Court's holding that Davis' trial attorneys could and should have discovered the suppressed favorable evidence and for that reason no *Brady* error exists……………………………………………………………..8

    B. Reasonable Jurists Could Debate the *Brady* Materiality of the Suppressed Records in the 1992 Guilt-Innocence Trial. …………18

        a. Applicable Legal Principles…………………………………....18

        b. Materiality is Established in This Case……………………..20

        c. Key Points to Show Mr. Davis' Confession was False……...26

        d. Key Points re: Eyewitness Evidence…………………………..29

      e.   Key Points re: the Physical
          Evidence………………………………………………...32

      f.    Key Points re: DNA Testing Exonerating Davis…………..36

      g.   Key Points re: Fingerprint Evidence Excluding/Exculpating
          Davis………………………………………………….....38

III.    FALSE EVIDENCE RENDERED MR. DAVIS' CAPITAL
       SENTENCING TRIAL UNCONSTITUTIONAL          45

    A.    Relevant Facts ....................................................................... 45

    B.    Post-conviction recantation of DNA evidence ................... 48

    C.    Applicable Legal Principles and Standard of Review ........ 51

    D.    Prejudice ............................................................................... 52

    E.    The District Court Erred in Several Important Respects ................. 55

CONCLUSION ................................................................................... 60

CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING
STANDARDS ....................................................................................... 62

CERTIFICATE   OF   COMPLIANCE   WITH   TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS ............................................................................... 63

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ake v. Oklahoma*,
    470 U.S. 68 (1985)……………………………………………………………..57

*Banks v. Dretke*,
    540 U.S. 668 (2004)……………………………………………10, 11, 12, 17

*Brady v. Maryland*,
    373 U.S. 83 (1963)………………8, 9, 10, 11, 12, 17, 18, 19, 20, 39, 40, 45

*Brecht v. Abramson*,
    507 U.S. 619 (1993)…………………………………………52, 55, 56, 57, 59

*Buck v. Davis*,
    137 S. Ct. 759 (2017) …………………………………………………..……7

*Cone v. Bell*,
    556 U.S. 449 (2009)…………………………………………………....…39

*Johnson v. Mississippi*,
    486 U.S. 578 (1988)…………………………………………….……51, 52

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003)…………………………………………………….6

*Slack v. McDaniel*,
    529 U.S. 473 (2000)………………………………………………….……7

*Smith v. Cain*,
    565 U.S. 73 (2012) ……………………………………………….…19, 39, 40

*Tuggle v Netherland*,
    516 U.S. 10 (1995) ………………………………………………...…56, 57

*United States v. Agurs*,
    473 U.S. 667 (1976)……………………………………………..……19, 39

*United States v. Bagley*,
427 U.S. 97 (1985)……………………………………………..…11, 19

*Wearry v. Cain*,
577 U.S. 385, 136 S.Ct. 1002 (2016)………………………………19, 40, 45

*Wood v. Bartholomew*,
516 U.S. 1 (1995)……………………………………………..……44

*Youngblood v. West Virginia*,
547 U.S. 867 (2006)………………………………………………...…18

*Banks v. Thaler*,
583 F.3d 295 (5th Cir. 2009)…………………………………....12, 17

*Boyette v. Lefevre*,
246 F.3d 76 (2d Cir. 2001)……………………………………….39

*East v. Scott*,
55 F.3d 996 (5th Cir. 1995)……………………………………...…26

*Floyd v. Vannoy*,
894 F.3d 143 (5th Cir. 2018)………………………………………*passim*

*Hughes v. Quarterman*,
530 F.3d 336 (5th Cir. 2008)……………………………………….52

*Pippin v. Dretke*,
434 F.3d 782 (5th Cir. 2005)…………………………………..…….8

*Simmons v. Epps*,
654 F.3d 526 (5th Cir. 2011)……………………………………….52

*United States v. Brown*,
650 F.3d 581 (5th Cir. 2011)……………………………………....9

*Paxton v. Escamilla*,
590 S.W.3d 617 (Tex. App.—Austin 2019)……………..…………...…16, 17

Statutes

28 U.S.C. § 2253……………………………………………………………………..6

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 24-70006**

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

Brian Edward Davis,
*Movant*

v.

Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional
Institutions Division,
*Respondent.*

_____

On Motion for Certificate of Appealability from
the United States District Court
for the Southern District of Texas

_____

Brian Edward Davis requests that this Court grant a certificate of appealability

("COA") so that he may appeal the district court's denial of two claims: (1) that Davis

was deprived of suppressed favorable and material evidence during his 1992 capital

trial in violation of the Due Process Clause of the Fourteenth Amendment ("*Brady*

claim");[1] and that (2) false DNA evidence was presented to his capital re-sentencing jury in 2011 for their reliance in deciding whether to impose the death penalty, in violation of the Eighth Amendment's heightened reliability requirement for capital sentencing evidence under *Johnson v. Mississippi*.[2] Because this briefing is in support of a motion for COA, it is directed to making that particular showing and is not intended to serve as briefing on the merits of any appellate issue created by the district court's judgment.

## STATEMENT OF THE CASE

### I.     Introduction

These matters warrant full and thorough debate by reasoned jurists, and a COA should issue.

### A.     Case Facts

Mr. Davis was convicted of capital murder on June 11, 1992, and sentenced to death on June 16, 1992, in Harris County District Court. ROA.2620, 1992 Trial 1 CR 256, 257.[3] After extensive post-trial proceedings in both state and federal court, the Texas Court of Criminal Appeals set aside Davis's death sentence in 2009. In

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).
[2] *Johnson v. Mississippi*, 486 U.S. 578 (1988).
[3] Citations in this application will be to the ROA where available. The state trial court record in this case, includes the Clerk's Record [cited herein as "CR"], and the Reporters Record [cited herein as "__ RR __" where the volume precedes and the page number follows].

2011, the State of Texas held a punishment-only retrial with the Honorable Judge Belinda Hill presiding. Davis was again sentenced to death on March 9, 2011.

The case-in-chief against Davis was for the murder of Michael Foster, an intellectually disabled man who lived by himself. Foster's body was found on Tuesday, August 13, 1991 around noon, stabbed to death, and importantly, in a state of very little decomposition.[4] The Medical Examiner Dr. Eduardo Bellas estimated that Foster had died around 1AM on Tuesday August 13, approximately twelve hours before his body was found by police. Lead homicide Detective Smith, who examined Foster's body when found around noon August 13, 1991, also testified that he too estimated Foster's time of death as occurring around 1AM Tuesday morning, approximately twelve hours before Foster's body was found around noon, agreeing with the ME Bellas' estimated time of death.

Detective Smith ultimately focused on Tina McDonald, Davis' then-wife of months, as the likely murderer, due to the highly idiosyncratic and unusual Skinhead writings found on Foster's wall (the initials "NSSH" and a swastika); learning that Tina McDonald was a member of the obscure Houston Skinhead group unknown to the general public, the NSSH, or National Socialist Skinheads of Houston; and finally, that Tina McDonald and Brian Davis were observed by one witness, bar

---

[4] The facts summarized here will be briefed extensively with ROA cites in the *Brady* claim, particularly in the *Brady* materiality section which requires review of the totality of evidence presented.

owner Ralph Ulrich, leaving with Foster from Ulrich's bar on either Friday night, August 9, 1991, or Saturday night, August 10, 1991, on the weekend before Foster's time of death. Ulrich initially could not recall to police what day he had last seen Foster leave his bar. Ulrich also initially stated to police he could not positively identify Davis in a photo lineup, but remembered a tattoo, and identified Davis' tattoo in a suggestive single-photo lineup.

Davis ultimately signed a confession, after significant pressure and coaching from the police, and claimed that he and McDonald had indeed left Ulrich's bar – the Pik-N-Pak -- late Friday night/early Saturday morning, and claiming that they killed Foster after the bar closed at 2AM early Saturday. Lead detective Smith testified he confirmed through two witnesses, Jarred and Chiarra Dennis, information that corroborated Davis' confession in one key respect, namely, that they had both been with Davis and McDonald at the Pik-n-Pak bar on Friday night, as Davis had told the police.

No witness, fingerprint or DNA evidence linked Davis to the crime scene in Foster's apartment. Davis was in fact excluded from all fingerprint and DNA evidence tied to the crime scene. Much of the evidence, in fact, was tied to Ms. McDonald, as well as individuals associated with the NSSH Skinhead group of Houston during this time period.

Lead detective Smith testified at the 1992 trial that all the evidence collected pointed towards Tina McDonald and (other than the confession), not to Brian Davis. Davis and McDonald had married months earlier before their arrest in August 1991, and McDonald had an infant daughter. Davis and McDonald were incarcerated for another stabbing incident, of Steven Sherman, when police focused on Tina McDonald as their prime suspect in the Foster murder. Jail officials allowed Davis and McDonald to communicate by phone at least four times while both were incarcerated, and lead detective Smith repeatedly told McDonald that all evidence pointed to her guilt for the Foster murder and none to Davis. Attempting to shield his young wife from the threat of a death sentence, and after months of communications from his wife McDonald allowing Davis to learn details from the crime scene, Davis attempted to obtain immunity for his wife by confessing to the Foster murder. While the State initially claimed there was no immunity agreement with McDonald, Davis nonetheless confessed to the Foster murder, getting many crime scene details wrong, and disputing the time of death in a manner wholly inconsistent with the official consensus as to Foster's time of death. McDonald ultimately received immunity for the Foster murder in a 1992 plea deal for the Sherman stabbing. Many years later Detective Smith wrote the Texas Parole Board requesting denial of parole for Tina McDonald, stating she was guilty of the Foster

murder but had been granted immunity in a quid pro quo for getting Davis to confess to the Foster murder.

## B. Procedural History

The District Court in its opinion stated "Davis' case presents a lengthy, and intricate, procedural history", ROA.2410, spanning over thirty-three years from Davis' arrest in 1991 until today. The District Court's lengthy memorandum opinion recounts the complex procedural history in Foster's case, including the numerous lower state court decisions spanning over thirty years. ROA.2410-ROA.2424.

Mr. Davis ultimately timely filed a federal habeas corpus petition in 2020, ROA.344 et seq, after exhausting the *Brady* and *Johnson v. Mississippi* claims set forth herein in state successor litigation. Ultimately the District Court denied all relief, and declined to issue a COA. ROA.2403. This timely appeal followed.

## ARGUMENT

## I.    STANDARD FOR CERTIFYING APPEAL

An appeal from the final order in a § 2254 proceeding requires the issuance of a COA before the merits may be addressed. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). A COA should issue when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El*, at 336. Where a district court has rejected constitutional claims on the

merits, the movant must demonstrate that reasonable jurists would find the district court's assessment of the claims debatable or that the issues are adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds, a COA should issue when the prisoner shows that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. *Id.*

For all constitutional issues (and their procedural components if any), the grant of a COA is a jurisdictional prerequisite to an appeal. *Miller-El*, 537 U.S. at 336. The statute thus forbids full consideration of the factual or legal bases adduced in support of the claims or procedural rulings. *Miller-El*, 537 U.S. at 336. When a court of appeals sidesteps this process by first deciding the merit of an appellate issue, and then justifying its denial of a COA based on that determination, it is deciding an appeal without jurisdiction. *Id. See also Buck v. Davis*, 137 S. Ct. 759, 773-74 (2017) (appellate court exceeded jurisdiction by justifying denial of COA on improper consideration of merit of appellate issues it should not have reached).

A district court's assessment of a claim or procedural ruling may be "debatable" even if every reasonable jurist might agree, after plenary appellate review, that the movant will not prevail on appeal. *Miller-El*, 537 U.S. at 338. In

capital cases, all doubts as to the appropriateness of a COA are resolved in favor of the movant. *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## II. REASONABLE JURISTS COULD DEBATE WHETHER MR. DAVIS' RIGHTS UNDER *BRADY V. MARYLAND* WERE VIOLATED BY THE STATE NOT DISCLOSING THAT PRIME SUSPECT TINA MCDONALD HAD BEEN INVOLVED IN PRIOR VIOLENT CRIMES INVOLVING HER SKINHEAD GROUP NSSH ("NATIONAL SOCIALIST SKINHEADS OF HOUSTON"), WHOSE INITIALS WERE FOUND SCRAWLED ACROSS DECEDENT FOSTER'S WALL AT THE CRIME SCENE, AND WHETHER SUCH SUPPRESSION MATERIALLY AFFECTED THE OUTCOME OF MR. DAVIS' 1992 G/I CAPITAL TRIAL.

Reasonable jurists could debate the district court's resolution of the *Brady* claim,[5] both as to whether an actionable *Brady* error even occurred in the case, and also as to whether the error materially affected the outcome of the 1992 guilt-innocence phase of the trial. These two aspects will be dealt with separately below.

### A. Reasonable jurists could debate the District Court's holding that Davis' trial attorneys could and should have discovered the suppressed favorable evidence and for that reason no *Brady* error exists.

The district court erroneously held that no *Brady* error exists in this case due to the lack of defendant's due diligence in uncovering the information. ROA.2475-ROA.2476, D.E. 99, at 73-74. "The court, however, observes that information about McDonald's earlier crime may have been available to Davis. Information that a

---

[5] *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

criminal defendant can easily discover is not 'suppressed' or 'withheld' within the meaning of *Brady*," citing *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011). ROA.2475.

The district court also erroneously points to the wrong proceeding in holding that "Davis has conceded that a diligent attorney could have developed information about [McFarland's][6] association and crimes with other skinheads", D.E. 99, at 74, ROA.2476, because Davis argued that his 2011 re-trial attorneys "were 'ineffective for not presenting" this suppressed evidence at that time, since it had by then been disclosed to them by the State. "Davis has not explained why the information was not equally available to his attorneys in 1992." ROA.2476, D.E. 99, at 74 n. 167.

Davis did, however, explain to the District Court why the information was not available to his attorneys during Davis' 1992 guilt-innocence trial: the 1991 Pasadena Police Department report *was suppressed from 1992 trial counsel*, who had never received the report despite asking for and being assured all *Brady* evidence had been turned over to him. *See* Affidavit of 1992 trial counsel Bob Scott, ROA.24483 (affirming that despite prosecutor assurances that all favorable evidence was disclosed, "at no time" did State disclose to defense *any* information about Tina McDonald and her involvement in crimes with local Skinhead groups). ROA.24483.

---

[6] Davis believes the Court was meaning to say Tina McDonald here, because there is no person with the last name McFarland involved in this case.

The 1992 guilt-innocence trial is when 1992 trial counsel could have made effective use of the suppressed information in challenging Davis' guilt at trial. And yet the Pasadena Police Department report was not produced to the defense until after new counsel was appointed *in 2010*, after Davis' death sentence was overturned for *Penry* II error by the state courts in 2009. D.E. 30, at 4, ROA.362. Only during pre-trial proceedings in the later, 2011 re-sentencing trial, did the new prosecutors disclose the 1991 Pasadena Police Department report to the new attorneys appointed to represent Davis in the re-trial. But by 2010, guilt could no longer be challenged under Texas law, because only Davis' death sentence had been overturned by the state courts in 2009. In fact Davis' attorneys did attempt to relitigate Davis' guilt for the 1991 Foster murder, after this critical exculpatory information was disclosed by the State, but this motion for a new guilt-innocence trial was opposed by the State and expressly rejected by the state courts. ROA.8173-ROA.8176, 2011 Punishment Retrial, 2 RR 11-13.

Reasonable jurists also could debate the District Court's resolution of the *Brady* claim, which denied Davis' *Brady* claim because defense counsel allegedly did not show diligence in investigating the suppressed facts. Reasonable jurists could debate the district court's resolution of the *Brady* claim because this Court has rejected the very basis of the district court's *Brady* due diligence rule, recognizing the Supreme Court's controlling contrary holding in *Banks v. Dretke*:

The State does not demonstrate compliance with *Brady*'s disclosure requirement by asserting a possibility Floyd could deduce that, based on the general evidence provided to him, additional evidence likely existed. To the contrary, the State's nondisclosure may have reasonably led the defense to conclude no additional evidence existed. *United States v. Bagley*, 473 U.S. 667, 682-83, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Further, the State's assertions the evidence was not withheld because Floyd could have conducted his own analysis are in direct contrast to clearly-established *Brady* law rejecting the defense's ability to conduct their own analysis as justification for prosecutorial non-disclosure. *Banks v. Dretke*, 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (holding "a rule thus declaring 'prosecutor may hide, defendant must seek', is not tenable in a system constitutionally bound to accord defendants due process"). Consequently, the state court could not have reasonably relied on that theory to find the evidence was not suppressed.

*Floyd v. Vannoy*, 894 F.3d 143, 162-63 (5th Cir. 2018). Reasonable jurists could therefore debate whether the district court here could have relied on a *Brady* due diligence theory to find the evidence complained of was not suppressed, as that theory contradicts both Supreme Court and this Circuit's law. *Floyd*, Id.; *Banks v. Dretke*, Id.

The Fifth Circuit's initial holding in *Banks v. Dretke*, that defendant lack of due diligence excused the State's obligation to produce exculpatory or impeaching *Brady* information to Banks, was overturned by the Supreme Court in *Banks*, 540 U.S. at 696, as recognized in *Floyd v. Vannoy*, Id. at 162-63. This Court on remand from the Supreme Court's decision in *Banks* thereafter abandoned its prior reliance on a *Brady* due diligence rule, instead accepting and applying the Supreme Court's holding in *Banks* that "a rule thus declaring 'prosecutor may hide, defendant must seek', is not

tenable in a system constitutionally bound to accord defendants due process". *Banks*, 540 U.S. at 696; see *Banks v. Thaler*, 583 F.3d 295, 299-300 (5th Cir. 2009) (upholding district court finding of *Brady* suppression of the Cook transcript, but finding *Brady* materiality not satisfied). This Court again affirmed *Banks*' no-*Brady* due diligence rule in *Floyd v. Vannoy*, 894 F.3d at 162-63. Reasonable jurists would debate, and indeed this Court has debated, that the District Court's rule applying a *Brady* due diligence rule to deny a *Brady* claim is contrary to the Supreme Court's controlling law in *Banks v. Dretke* and this Court's controlling precedents.

The District Court also asserts that trial counsel must have known about the suppressed evidence since "[t]rial counsel questioned witnesses in the 1992 trial about McDonald's violent acts with large groups of Skinheads"; nowhere, however, does the Court cite in the 1992 trial record where such questioning occurred, only in the 2011 record, where of course 2011 trial counsel had been provided the suppressed information. D.E. 99, at 73-74, ROA.2475-ROA.2476. While 1992 trial counsel attempted to glean information from State witnesses about the Skinheads and Tina McDonald, they did so without access to the critical information found in the 1991 Pasadena Police Report, and thus were stymied at every turn. Tina McDonald was allowed to take the Fifth in pre-trial proceedings, ROA.2953-ROA.2954, and State's witness Brian Courtney, who was a member of McDonald's NSSH Skinhead group, denied any knowledge of group violent activities.

ROA.6474- ROA.6475, 1992 Trial, 19 RR 3427-3428. *See also* Affidavit of Bob Scott, ROA.24483.

The District Court opinion also avers that Davis should have known or discovered what was contained in the suppressed 1991 Pasadena Police Department Offense Report because "Davis knew about his wife's former boyfriend Bryan Falconer who likely participated in the Pasadena home invasion with McDonald". DE 99, at 74 note 165, ROA.2476. Nowhere in the 1992 trial testimony, or in any records produced to Davis' 1992 trial counsel, is there any mention of the actual Pasadena Police Department Skinhead incident, or that Falconer or NSSH, Tina McDonald's Skinhead group, were involved in committing other violent crimes. This is so despite the fact that Falconer was identified as the main assailant, Suspect #3, in the undisclosed Pasadena Police Department offense report involving a Skinhead home invasion. ROA.24473-ROA.24476. Nowhere does the Court explain how Davis should have been able to uncover that someone not named as participating in his offense or in any offense report disclosed to Davis' counsel, was charged in a different unrelated violent crime which occurred six months before the charged Foster murder and at a time when Davis was in jail on a parole violation, and was a person who was not named as a suspect or even mentioned in any discovery provided by the State to Davis' 1992 counsel. *See* Affidavit of Bob Scott, *supra* ("At no time did the state provide the defense offense reports or bring to the Defenses' attention

information relating to Tina McDonald's involvement in so called home invasions, assault crimes, nor did the State inform the Defense that such home invasions were done in concert with members of Skinhead groups or other members of white supremacist organizations.") ROA.24483.

This is so despite the critical fact that Falconer *was also clearly a suspect in the Foster murder*: Harris County prosecutors sought and obtained the 1991 Pasadena incident report at issue here before the 1992 trial. The documents reflect that it was faxed to the Harris County DA investigator working for 230th District Court prosecutors in the case on April 15, 1992, several months *before Davis' 1992 jury trial began* on June 8, 1992. ROA.5545. At no time, however, did the prosecution disclose this information to the 1992 defense team.[7]

To be clear, federal habeas counsel first obtained access to the Humble Police Department Foster Homicide file only through a state court order issued in 2019. ROA.2343- ROA.2344, Reply to Amended Answer, D.E. 95, at 98-99. The 1991 Pasadena Skinhead investigation (contained in the Humble PD Foster murder files) clearly indicates that Falconer and members of the N.S.S.H. were investigated as

---

[7] In fact a mugshot of Falconer, himself an N.S.S.H. member and Skinhead associate of McDonald's, was found in the Humble Police Department's homicide investigation file for the Foster murder, ROA.2345, D.E. 95, at 100, in 2019, but the investigation into this alternate suspect or suspects was never noted in the files disclosed to 1992 trial counsel. ROA.24483.

potential suspects in the Foster murder. None of this information, however, was disclosed to trial counsel before or during the 1992 trial.

Although it was never disclosed to the defense in 1992, Falconer's status as a suspect in the Foster murder was justified. First, State's witness Brian Courtney saw Falconer physically present in the Houston area in mid-August 1991, around the time of the Foster murder, at a Skinhead party Courtney attended. Courtney described Falconer as having short shaved brown hair at that time typical of a Skinhead. ROA.6473-ROA.6474, 1992 Trial, 19 RR 3426-3427.

Moreover, Foster's upstairs neighbor, Jean Luckey, reported to Humble Police having seen two unknown males, *one matching Falconer's physical description*, knocking on Foster's door the night ME Bellas gave as the time of death for Mr. Foster. Finally, Ms. Luckey and another Foster neighbor, Sheryl Theis, separately reported hearing loud disturbances coming from Foster's apartment late Monday night around 2AM before his body was found Tuesday at noon. ROA.388, D.E. 30, at 30; citing Sheryl Theis Affidavit, ROA.27188, State Writ-I, Exhibit IATC-4.

It is important to understand that, despite the District Court's contrary conclusion, the critical information contained in the 1991 Pasadena file was not available to the 1992 defense team. The Pasadena report was also exempt from release to the defense and thus not reasonably discoverable under the Texas Public Information Act's "law enforcement exception", and therefore was legally

unavailable to Davis' 1992 trial counsel, even if Davis somehow had learned that the incident occurred, which his counsel Scott testified he did not. Tina McDonald was never formally charged in the case, so any public records searches with her name would not have produced the undisclosed information. "[W]hen a criminal investigation has terminated with an outcome other than a conviction or deferred adjudication, the records pertaining thereto are excepted from disclosure" under the law enforcement exception to the Texas Public Information Act. *Paxton v. Escamilla*, 590 S.W.3d 617, 622 (Tex. App.—Austin 2019).

Furthermore, Davis was in custody on an unrelated parole violation at the time of the Pasadena Skinhead incident, and had not even met McDonald yet. Davis was not from Houston, he did not then know any of the people named in that offense report, and was wholly unknown to Tina McDonald's Skinhead group, according to state witnesses and NSSH Skinhead members Robert Kelly and Brian Courtney. McDonald and the Pasadena Skinhead incident's main assailant, Bryan Falconer, were suspects given that NSSH's initials were found on murder victim Foster's apartment wall, and McDonald and Falconer together committed the Pasadena NSSH Skinhead assault.

Without any indication from some source that Tina McDonald and her Skinhead group were known to engage in violent crimes as a group, including homicides, as described in the Pasadena Offense Report, ROA.24472, Davis' trial

counsel would have to be either clairvoyant or a mind reader to be able to know of an incident outside their client's personal knowledge, not mentioned in any police report to which they had access, to surmise that such a report existed. Even if they had surmised the existence of that report, by law Davis' 1992 trial counsel would not have been able to independently access it because charges against Falconer were dismissed and his case was "terminated with an outcome other than a conviction or deferred adjudication." *Paxton v. Escamilla*, Id.

The District Court's conclusion that these records were reasonably available to diligent defense counsel before the 1992 trial is thus neither factually accurate nor legally relevant under *Banks*. Reasonable jurists could thus debate, and this Court has debated in *Floyd v. Vannoy*, the District Court's reliance on such a *Brady* due diligence requirement that excuses prosecutor's *Brady* duties unless the defense exercises due diligence in discovering the same information known and possessed by the State. *See Banks, supra* at 696 ("a rule thus declaring 'prosecutor may hide, defendant must seek', is not tenable in a system constitutionally bound to accord defendants due process"); *see also Banks v. Thaler*, 583 F.3d 295, 299-300 (5th Cir. 2009) (finding *Brady* suppression established without requiring defense diligence). This Court has twice reaffirmed the Supreme Court's no *Brady* due diligence rule stated in *Banks v. Dretke* in *Floyd v. Vannoy*, Id. at 162-63, and *Banks v. Thaler*, Id. at 299-300.

That the suppressed material was indeed favorable is also clear. As 1992 trial counsel Bob Scott's Affidavit establishes, the suppressed Pasadena Police Department files "would have clearly provided the defense an alternate theory as to the actual person or persons who committed the Foster murder because of the skinhead writings found on Foster's apartment wall, and physical evidence linking Tina McDonald to Foster's murder. There was no physical evidence connecting Mr. Davis to the Murder of Mr. Foster, Mr. Davis' confession was therefore the key piece of evidence against Mr. Davis, as our defense at trial was that Mr. Davis falsely confessed to the Foster murder in exchange for immunity from prosecution for his then-wife Tina McDonald. Both of the above categories of evidence that were withheld from the defense by the State would have been extremely helpful in presenting Mr. Davis' defense and would likely have resulted in his acquittal." ROA.24483.

## B. Reasonable Jurists Could Debate the *Brady* Materiality of the Suppressed Records in the 1992 Guilt-Innocence Trial

(1) Applicable Legal Principles

Suppressed *Brady* evidence is material where it demonstrates "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (quoting *Strickler*, 527 U.S. at 280, 119 S.Ct. 1936 ). A reasonable probability is a likelihood sufficient to "undermine confidence

in the outcome", *Bagley v. U.S.*, 473 U.S. at 682, 105 S.Ct. 3375 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 ). Accordingly, withheld evidence is more likely material when the State presents a weaker case for guilt, e.g. , *Smith v. Cain*, 565 U.S. 73, 76, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012) (eyewitness "testimony was the only evidence linking [the petitioner] to the crime", and, therefore, the undisclosed statements contradicting this testimony were "plainly material"); *Agurs*, 427 U.S. at 113, 96 S.Ct. 2392 ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

Evidence qualifies as material [under *Brady*] when there is " 'any reasonable likelihood' " it could have " 'affected the judgment of the jury.'" To prevail on his *Brady* claim, [a defendant] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 565 U.S. 73, ——– – – ——, 132 S.Ct. 627, 629–631, 181 L.Ed.2d 571 (2012) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. Ibid. Wearry can prevail even if…the undisclosed information may not have affected the jury's verdict." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 and n. 6 (2016).

In *Floyd v. Vannoy*, 894 F.3d 143, 165-66 (5th Cir. 2018), this Court had occasion to consider the very materiality issue presented here, in the context of a case

where the defendant had also confessed to the crime. In *Floyd*, the defendant confessed to police that he committed the murder after bragging that he committed the unsolved murder during an argument with a bartender. *Floyd*, 894 F.3d at 150. The murder was publicized in local media, but, as in this case, no witness or physical evidence tied Floyd to the murder scene. Id. at 151. Years later, suppressed fingerprint evidence was disclosed, revealing that Floyd's fingerprints were affirmatively not a match for the fingerprints recovered from the murder scene. Floyd, 894 F.3d at 165-66. This Court in *Floyd found* Brady materiality, and Floyd was granted a new trial, despite Floyd confessing the murder. *Floyd*, Id. at 151.

(2) Materiality is Established in This Case

The District Court concluded that the suppressed information was not material: "Davis does not allege any direct connection between the Pasadena home invasion and Foster's murder. The record shows that McDonald was present during the Foster murder. Any suggestion that other skinheads committed the Foster murder because McDonald associated with them is sheer speculation. Davis has not pointed to any evidence positively identifying any skinhead friend who allegedly committed the Foster murder with her. The Pasadena crime does not provide any insight into whether or not Davis fabricated his confession, which was the most important evidence against him. At best, the police report provides a challenge to a

non-testifying co-defendant's character through her involvement in an unrelated offense six months before Davis's crime." ROA.2477-ROA.2478, D.E. 99, at 75-76. The District Court's resolution here is faulty, and at the very least is subject to debate among rational jurists.

It cannot be overstated the critical importance of the undisclosed 1991 Pasadena police files to the defense strategy and case in 1992. Although Brian Davis had confessed to the crime, its details were demonstrably flawed and, at least as to time of death, fatally so. Davis' insistence on a supposed Friday night killing of Foster simply could not be conformed to the undisputed physical evidence: both investigating officers and the ME assigned to the case recorded well-known and widely accepted time-of-death indicators pointing to a 1 AM Tuesday death *at the earliest*, three *days* after Davis claimed he was with Foster and had killed him. In fact Davis' claim about being with Foster on Friday was corroborated: he had indeed been seen by independent, objective witnesses with the victim that Friday night, when Foster was reportedly alive and well. But Foster was not killed on Friday night, and no witness ever claimed seeing Davis with or near Foster three days later when Foster was actually murdered.

Independent, objective witnesses did see two *other* persons banging on Foster's door on Monday night shortly before he was murdered, one of whom fit the description of Bryan Falconer, a known member of the skinhead group whose initials

were carved into Foster's bedroom wall. Neighbors also heard loud noises coming from inside Foster's apartment right around the established time of death, early Tuesday morning.

But Foster had been killed by someone, and the murder scene was highly idiosyncratic in two key respects: the initials of an obscure Houston skinhead group were scrawled on the walls of Foster's bedroom, and a widely-used skinhead moniker, the swastika, was carved into Foster's chest. So while trial counsel attempted to attack the confession in the above and other respects, they had no credible information pointing to skinhead suspects other than Tina McDonald herself. They were wholly unaware that, buried in prosecutor Kelly Siegler's file, were faxed copies of police reports from Pasadena PD implicating not only McDonald, but a group of skinhead individuals, including Falconer himself, who were known to be connected with the sub-group whose initials were found at the scene, in a series of violent home-invasion type crimes *just like the murder of Michael Foster*.

To suggest this suppressed information was not material to the outcome in the case not only questions the truth of trial counsel Bob Scott's affidavit, but it flies in the face of the available facts, as complicated as they may be here in some respects. And it is surely beyond reasonable debate whether this is so.

Trial counsel had some helpful information to attack the obviously flawed confession; what they lacked was evidence pointing to an alternate suspect(s). Brian Davis himself had no connection to the Skinhead group NSSH, and he appeared unaware when first questioned by police about the skinhead signs at the murder scene. The undisclosed Pasadena police reports pointed directly to NSSH individuals, who, as noted, were themselves undisclosed suspects in the Foster murder before Davis confessed. One of the Pasadena NSSH suspects, Bryan Falconer, bore a striking resemblance to a person described by an eyewitness; and as an NSSH member was directly linked to the most unique, identifying feature of the case, namely, the swastika and skinhead writing on the wall with the initials "NSSH" and swastika on the victim's stomach.

The Pasadena Police Department report also showed that McDonald was capable of leading her Skinhead group, NSSH, in committing violent crimes, something that 1992 trial counsel had no evidence of from any other source at the time of the 1992 trial. As noted, Skinhead writings containing the initials of the obscure Skinhead group McDonald belonged to, "NSSH," a group unknown to the general public, were found written on the wall at the Foster crime scene. ROA.5976, 1992 Trial 16 RR 2943. The suppressed 1991 Pasadena Police Department offense report noted that McDonald's Skinhead group was known to the victim of the Pasadena crime, Jason Crawford, a fellow Skinhead, to be responsible for

committing violent crimes, "including homicides." ROA.24472. These allegations of other homicides linked to Tina McDonald's NSSH Skinhead group in the Pasadena PD offense report would have set off alarm bells to 1992 trial counsel, had they known about them. That information would have been extremely relevant to Davis' 1992 trial counsel to further investigate, to develop the evidence then fresh and available in 1991, and to challenge the thoroughness and integrity of the investigation of Davis, that was based almost exclusively on his confession. The knowledge of the Skinhead violent incident involving Tina McDonald, Bryan Falconer, and a group with the moniker "NSSH" would have likely resulted in Davis' acquittal, as 1992 counsel Bob Scott attests. *See* Affidavit of Bob Scott, *supra.*

With this suppressed information from the 1991 Pasadena Police Department report mentioning Tina McDonald, Skinheads and homicides, 1992 trial counsel would have been able to identify Bryan Falconer as the main assailant in the Pasadena Police Department investigation, as well as an early suspect in the Foster murders. Counsel could have attempted to interview him and his NSSH associates after the charges against him in the Pasadena Skinhead incident were dropped. Indeed, an affidavit provided by Bryan Falconer in the seventh state habeas petition, which challenged only the 2011 punishment retrial, and not the 1992 guilt-innocence finding, shed some light on the 1991 Pasadena Skinhead incident, as well

as on at least Tina McDonald's role in the Foster murder and in Brian Davis' false

confession:

> "There was one time that Tina got me and six or seven others to jump some dude. He was a skinhead who had turned state's evidence. I did not even know the dude or anything about him. I did not even know his name. I got arrested on that for burglary of habitation and intent to assault, and served about six months.[8] I was the only one who got picked up….The guy eventually dropped the charges, because Tina and the others scared the guy into it. He then said the police had coerced him or something, but Tina was the one who organized the whole thing….I think Tina is the one who killed that guy. We talked about it when she was still in county jail, which would have been around July of 1993. She didn't totally say she did it but she gave that impression and I could see her doing it. She said she stabbed him. It does not take a big person to stab someone. She also told me that she and Brian had an agreement that Brian would cop to it and she would get immunity and then say at trial that she did it. She ended up pleading the Fifth at the trial."  Bryan Falconer Affidavit, ROA.20154-ROA.20155.

In trial counsel Scott's affidavit given decades after his representation of Davis, the suppressed evidence in his professional opinion "would have been extremely helpful in presenting Mr. Davis' defense and would likely have resulted in his acquittal." Affidavit of Bob Scott, 1992 Trial Counsel. ROA.24484.

---

[8] Curiously, Falconer conveniently places himself in jail at the time of the Foster murder. In fact Falconer's publicly available on-line docket sheet (searchable using Cause No. 058913901010 at https://www.hcdistrictclerk.com/Edocs/Public/search.aspx), indicates his charges were dismissed on 4/23/1991, and thus he would have only served approximately a month and a half in jail, not the six months he claimed, and he would have been free at the time of the Foster murder in August 1991. Brian Courtney's previously quoted 1992 trial testimony confirms this. ROA.6473- ROA.6474.

As this Court's precedents make clear, all relevant details of the case must be considered when assessing materiality, and this is no easy or simple task. *See Floyd,* Id. at 166, *supra* (30 page opinion addressing materiality in similar capital case). To save space, such details are organized and itemized in what follows.

<u>Key Points to Show Mr. Davis' Confession was False</u>

- Davis' confession "was the most important evidence against him" in the District Court's opinion. D.E. 99, at 76, ROA.2478. Without his confession, the prosecutor admitted in closing argument that Davis would not even have been charged. D.E. 30, at 30-31 (1992 Trial, 17 RR 3067, ROA.6104 ("Brian Davis made an unwise confession. Heck yeah. Capital murder charges were filed on him because of it. … And maybe nothing would have ever happened had Brian Davis not confessed, but he did.")).

- Davis, however, insisted in his confession that he murdered the victim Foster on Friday night/early Saturday morning, the night Davis helped load his friend Jarred Dennis' drum set at the Pik-n-Pak bar. This is a critical fact which was confirmed by the lead Detective Smith early in his investigation when he interviewed Tina McDonald's friend Jarred Dennis in 1991, who according to Detective Smith confirmed that Jarred Dennis met Davis at the Pik-N-Pak on Friday night, as Davis stated. D.E. 30, at 28-29, ROA.386-ROA.387; ROA.5962-ROA.5964, 1992 Trial, 16 RR 2929-2931 (Detective Smith testimony).

- When Davis was confronted with this time discrepancy by Det. Smith days after his November 1991 confession, Davis continued to insist that he killed Foster late Friday night/early Saturday morning as he stated in his confession and could not explain the time discrepancy. See ROA.24108, Exhibit 3, Humble PD Offense Reports, p. 2.01.032) ("On 11-22-91 Det Smith spoke with Jarred and Chiara Dennis at 630-0695. Jarred checked his calendar and found that his band Coma-Toast played at Pik-N-Pak on Friday 08-09-91 and that Tina and Brian were there but that he and Chiara left before Tina and Brian did. On 11-25-91 Det's Smith and Hendricks met with Brian Davis at County Jail

there Davis was confronted with what appears to be a descrepancy [sic] in the time of death of victim. Davis's account would put the death in the early morning of Saturday 08-10-91 and the body was discovered at noon on 08-13-91 and the victim had very little decomposition. Davis stated he was telling the truth about the time and he could not explain the descrepancy [sic]"). D.E. 30, at 28-29; *see also* ROA.2929-ROA.2931 (Detective Smith testimony confirming same). Under Davis' confession, Davis killed Foster <u>approximately 72 hours before</u> the undisputed time of death according to both the Medical Examiner Dr. Bellas and Detective Smith, both of whom estimated Foster's time of death being within 12 hours of his body being discovered around noon Tuesday 8-13-1991.

- Detective Smith admitted under cross-examination: "Q. In fact, the only time Brian Davis and Tina McDonald were with Michael Foster was in the early morning of Saturday, and Michael Foster died on Tuesday, then Brian Davis could not be the person. Correct? A. That's correct." 1992 Trial, 16 RR 2936, ROA.5969. Detective Smith thus admitted that "the most important evidence against him [Brian Davis]", his confession, D.E. 99, at 76, ROA.2478, did not match the undisputed known time of Foster's death, according to Medical Examiner Dr. Bellas and Detective Smith's own observations of rigor mortis, ROA.5969, and therefore Davis' confession could not be true.

- Even if you accept the prosecutor's 1992 trial theory that the night Davis and McDonald were seen leaving the Pik-n-Pak was Saturday night as later claimed at trial by the bar owner Ulrich, a date Ulrich was initially unsure of when interviewed according to Detective Smith, ROA.24491 and ROA.5894, 1992 Trial, 16 RR 2861, and not Friday, the uncontested evidence from both the Medical Examiner Dr. Bellas, and lead detective Smith was that Foster was killed within twelve hours of being found by detective Smith on Tuesday at noon, based on their observations of rigor mortis. ROA.5588-ROA.5589, 1992 Trial 15 RR 2559-2560 (Medical Examiner Dr. Eduardo Bellas testimony); ROA.5969, 1992 Trial 16 RR 2936 (Detective Smith testimony); argued at ROA.386-ROA.387 (D.E. 30, at 28-29). That time discrepancy of between 48 and 72 hours when Davis' confession stated he killed Foster, given it was uncontested Davis was seeking immunity from capital murder charges for his then-wife

McDonald, even under the prosecution's version of events, makes Davis' confession the slimmest of reeds upon which to hang his guilt, because Davis' version of the murder was that it occurred after driving Foster home from the Pik-N-Pak bar Friday night/Saturday morning (72 hours before the conceded time of Foster's death), or under the prosecution's theory Saturday night/early Sunday morning (48 hours before the conceded time of death).

- Defense counsel argued strenuously during closing that the time discrepancy between the undisputed time of death given by the State's witnesses Dr. Bellas and Detective Smith and Davis' confession showed that his confession could not be true. 1992 Trial counsel argued at closing:

"And what did you hear today even though Detective Smith told you all the evidence in the case was against her you heard today no capital case was ever filed against Tina McDonald. One of the things that we know for a fact, one thing we know for a fact is this didn't happen Friday night on the 9th like some witnesses said. Detective Smith said two witnesses told him that Brian Davis was at the Pik N Pak on Friday night and on the video, that's what Brian Davis says. They keep trying to get him to change it to Saturday and Brian says no, I was at the Pik N Pak on Friday. That's the 9th.

When did Michael Foster die? We do know that. Probably the only fact in this case that's not disputed. Dr. Bellas, the Medical Examiner, at the end of his examination, addressed that point. I ask him, "Doctor, are you telling us in relation to the time of death it would have happened after 1:00 a.m. on the 13th day of August, 1991? Correct. All right, sir. Sometime after 1:00 o'clock or 1:00 a.m. on the 13th. Right. Correct."

That's the Medical Examiner telling you that Michael Foster didn't die on Friday or Saturday or Sunday or any of the days that there is any evidence regarding Brian Davis. He died after 1:00 a.m. on Tuesday. The day his body was discovered about noon. You also hear that on the video. Detective Smith is upset about it. Detective Smith says on the video, I got to the house about 1:00 p.m. on Tuesday. On the video he says, "Brian, when I saw the body, I could tell that he had been dead less than 12 hours."

What does that give you? From 1:00 p.m. on Tuesday, you go back 12 hours. You are at 1:00 a.m., on Tuesday, the 13th. Interestingly Dr. Bellas, through his medical examination, also determined exactly

what Detective Smith determined. This death didn't occur at the times they are putting Brian Davis with Michael Foster. It happened three days later.

On the video for some reason Detective Smith keeps calling it this 24 hour discrepancy or 24 hour problem or 48 hour problem. It's not a 24 hour or 48 hour problem. **It's two witnesses that say it happened on Friday other witnesses saying it may be Saturday, and the Medical Examiner saying it happened on Tuesday. There is no way you can reconcile that. That means the confession has to be false.**

1992 Trial, 17 RR 3047-49, ROA.6084-ROA.6086.

- 1992 Trial counsel in closing argument also pointed out that the police fed Davis information from the crime scene that Davis could not and did not independently provide, contaminating Davis' confession and severely weakening its reliability. ROA.6086, 1992 Trial, 17 RR 3049. This Court has held that the credibility of a confession is "severely weakened by evidence that, during the interrogation, detectives provided Floyd with significant details about the crime scenes." *Floyd v. Vannoy*, 894 F.3d at 158.

- Davis's confession as to the timing when Davis met Foster at the Pik-n-Pak bar on Friday night, left the bar with Foster, and killed Foster, as occurring on Friday night/early Saturday morning August 10, 1991, was corroborated by lead homicide detective Smith through independent witnesses Jerry (Jarrod) Dennis and Kearra Dennis as to timing and was true according to Detective Smith. ROA.5964-ROA.5965; 1992 Trial, 16 RR 2931.

Key Points re: Eyewitness Evidence

- Both estimated times of death given by Dr. Bellas and Detective Smith are also consistent with Foster upstairs neighbor Jean Luckey's testimony in the 2011 punishment retrial, and her statements given to police Tuesday August 13, 1991, the day Foster's body was found. Luckey testified that she heard a party coming from Foster's apartment directly below her late Monday night, August 12, 1991, before Foster's body was found, with music playing and Foster's apartment door opening and closing very late at night the Monday night before Foster's body was found by Luckey and Foster's former roommate Clare AKA Lavora Philips, on Tuesday August 13, 1991 at noon. ROA.11624-ROA.11626; 2011 Trial, 17 RR 134-136. Luckey had also seen Foster

late Monday night and Luckey tried to talk to Foster but Foster just rode off on his bike. ROA.11625. Luckey told Foster's ex-roommate Lavora AKA Clare Philips who told police that Luckey had seen Foster between 11:00PM and 11:30PM late Monday night, that Foster was wasted and Luckey tried to talk to Foster but he just rode off on his bike. ROA.24134.

- Luckey seeing Foster alive late Monday night, and thus disproving Davis' confession as unreliable and physically impossible, is corroborated by Foster friends Kerry Neal Day and Donna Motilal. Kerry Neal Day told police in 1991, ROA.24491, and provided an affidavit that Day "saw Mike (Foster) on Saturday August 10, 1991 at Rudyard's Club about 9-10pm and he was alone." ROA.24548. Foster friend Donna Whitely Motilal also told police on August 23, 1991, ROA.24490, and provided an affidavit that "I knew Mike Foster (by name and sight) and I saw him walking around on Saturday 8-10-91 or Sunday 8-11-91 at the gas station where I worked." ROA.24550. Three witnesses (Jean Luckey, Kerry Neal Day, and Donna Motilal) thus gave police statements stating they each saw Foster alive days after Davis confessed he had killed Foster late Friday night/early Saturday morning, proving Davis' confession must be false.

- Luckey told police the day Foster's body was found, Tuesday August 13, 1991, that Luckey saw two males not matching Davis' physical description knocking on Foster's apartment door late Monday night/early Tuesday morning, the same night she testified to hearing a party, music, and doors slamming coming from Foster's apartment below her late Monday night. Luckey testified she heard the party coming from Foster's apartment Monday night and saw Foster riding his bike that night. ROA.24355- ROA.24356.

- The descriptions of the white males upstairs neighbor Luckey gave police the day Foster's body was found, that Luckey had seen approximately 12-14 hours earlier knocking on Foster's door, were: "W/M with light brown hair cut real short with a mustache and was around 5'9" and had a rugged-looking face. Ms. Luckey said he was dressed in a red t-shirt and beige pants." Luckey described the other subject as "a W/M around the same height as the first subject, and he had a pot belly and she thought that he had dark hair." EROA.24355-EROA.24356.

- Tina McDonald's ex-boyfriend Bryan Falconer, the main assailant in the suppressed February 1991 Pasadena Police Department offense report of the NSSH Skinhead group assault, the subject of this *Brady*

claim, was seen by 1992 trial witness Brian Courtney as being present in the Houston area in mid-August 1991, victim Foster's time of murder according to both ME Dr. Bellas and lead detective Smith being 1AM August 13, 1991. Falconer was at a party attended by other Skinheads members of Tina McDonald's Skinhead group NSSH in Alvin, a Houston suburb. Falconer was described by Courtney as being then a Skinhead member of Tina's NSSH Skinhead group and having "a shaved head, of course and he was brownish-colored" and "Well, I mean that's usually the stereo typical like aspect for a skinhead, usually you don't get looked at as being a skinhead unless you have a shaved head." ROA.6473-ROA.6474. Courtney testified he believed he met Brian Falconer (spelled by the court reporter phonetically as Faulkner) through Jason Crawford. ROA.6473. Jason Crawford was the Skinhead victim of the February 1991 Pasadena Police Department report Skinhead incident, ROA.24472, where Tina McDonald led the Skinhead group in the assault of Crawford and Bryan Falconer was the main assailant, ROA.24476, and where Crawford described Tina McDonald's Skinhead group as being involved in "auto thefts, homicides and drugs", ROA.24472, and later voluntarily dropped charges against Falconer, according to Falconer because of threats to Crawford from McDonald. Bryan Falconer is described in the Pasadena Police Department report as a "W/M, 23, 5'11", 148 lbs." ROA.24475. Falconer's mugshot from his 2/16/1991 Pasadena Police Department arrest documented in the suppressed February 1991 Pasadena Police Department Skinhead incident report, ROA.24480, was found in the Humble Police Department Foster Murder investigative file pursuant to a 2019 State Court order but suppressed from 1992 trial counsel. Falconer's mugshot shows that Humble Police investigating the Foster murder collected Falconer's mugshot as a potential suspect in the Foster murder, and shows Falconer to have a pockmarked face. ROA.2345, D.E. 95, at 100. Foster upstairs neighbor Luckey described one of the two white males who knocked on Foster's door late Monday night as "W/M with light brown hair cut real short with a mustache and was around 5'9" and had a rugged-looking face", matching Falconer's physical description from then-contemporary witnesses Courtney and Luckey. ROA.24355. This description given by Foster upstairs neighbor Luckey did *not* match a photo of Brian Davis taken approximately five days after the Foster murder and Luckey's observation, when Davis was arrested for the Steven Sherman stabbing, and was photographed at the scene. Davis had hair extending to nearly

the bottom of his ear, does not have a pockmarked face, and does not have a pot belly but is clearly slim. ROA.14560, ROA.14562, 2011 Punishment Retrial, Vol 31 SX 223. Davis was arrested by HPD officer Mark Sebesta for the Sherman stabbing incident and had his photo taken at the scene on August 17, 1991, four days after Foster's body was found Tuesday noon August 13, 1991. ROA.5747, 1992 Trial, 15 RR 2718.

- Foster upstairs neighbor Luckey described the second male seen knocking on Foster's apartment door late Monday night as "W/M around the same height as the first subject and he had a pot belly and she thought he had dark hair." ROA.24355-ROA.24356. Davis does not match the description of the second male seen by Luckey either, as Davis had sandy hair not dark hair, and is very slim with no pot belly when arrested for the Steven Sherman stabbing incident on August 17, 1991, five days after Luckey's observation of the two males on Monday night August 12, 1991. ROA.14562, ROA.14560. 2011 Punishment Retrial, Vol 31 SX 224, SX 223. s

- Approximately twenty years after the February 1991 Pasadena Police Department incident report, Falconer gave an affidavit asserting that McDonald told Falconer that she and Davis had an agreement, where Davis would initially take the blame for the Foster murder so that McDonald could get immunity and then at trial McDonald would testify that she was actually the one responsible for Foster's murder. ROA.536, citing D.E. 30 (ROA.20155, Ex. 11 at ¶11 [Affidavit of Bryan Falconer]; ROA.20284, Ex. 29 [3/30/00 Aff. of Tina McDonald]; ROA.20289, Ex. 30 [9/29/00 Aff. of Tina McDonald].)

Key Points re: the Physical Evidence

- Davis' confession did not match the known physical evidence in numerous areas, which were cataloged in the Federal Writ Petition. DE 30, at 15 et seq, ROA.373 et seq. Among those physical discrepancies were: Davis said he used a dagger to kill Foster, a knife which has two sharp edges, while the Medical Examiner determined the wounds were caused by a knife with a single edge, thus rendering his confession to murdering Foster physically inconsistent with Dr. Bellas' findings. ROA.375-ROA.376. Dr. Bellas's opinion was that Foster's wounds were caused by a single-edged knife, not two different knives, one double-edged and one single-edged. ROA.5593- ROA.5594, 1992 Trial, 15 RR 2564-2565 (Dr. Bellas testimony).

- Detective Smith also determined from his review of Foster's body that Foster's wounds were not caused by a dagger with two edges, but by a single-edged knife: "Q. And did you have the opinion it was a knife with one blade or a knife with two blades, such as a dagger, two sharp edges? A. Yes, single edged knife." ROA.5971, 1992 Trial, 16 RR 2938 (Detective Smith). "Q. So when Brian Davis says on the confession he originally said he used a dagger with two sharp edges, that was inconsistent. Is that correct? A. Yes, it was." ROA.5973, 1992 Trial, 16 RR 2940 (Detective Smith testimony).

- "Detective Hendrix interrupts him and tells him you must have used some other knife and Brian say "Yes, I must have use another knife. And they said, "Were the shoes on or off? And he said, "Oh, well, one shoe was on and one shoe was off." ROA.6086. Both of Foster's shoes were off and laying on the floor between the body and door when Foster was found. ROA.5819.

- When asked both before the taking of his confession and again during his confession about the Skinhead writing on Foster's apartment wall, Davis knew nothing about any writing on Foster's wall, or who had written on Foster's wall. The detectives taking Davis' confession then told Davis there was writing on the wall that Davis was unaware of. When Davis again denied knowing anything being written on the wall, detectives then showed Davis a photo of the NSSH (National Socialist Skinheads of Houston) writing on the wall, irretrievably contaminating Davis' confession by feeding him information from the crime scene that Davis was unaware of and could not independently provide. ROA.20238, Davis Confession, at 14. After first stating he knew nothing about writing on the wall, or who had written on Foster's wall, Davis was then told by the detectives there was writing on the wall. Detectives then showed Davis a photo of the writing on Foster's wall, further contaminating Davis' independent recollection. Davis then said he recognized the writing, and that he told Tina McDonald to write on the wall, two facts moments ago he had denied knowing. Id. Where the State asserts that the credibility of a confession was demonstrated through volunteering specific crime-scene details, "[t]hese assertions are severely weakened by evidence that, during the interrogation, detectives provided Floyd with significant details about the crime scenes. Notably, Floyd's descriptions regarding the position of Hines' body do not accurately describe the scene as found by police, but, rather, correspond to crime-scene photographs taken after Hines' body was moved." *Floyd v. Vannoy*, 894 F.3d at 158. The credibility and

probative value of Davis' confession was "severely weakened by evidence that, during the interrogation, detectives provided significant details about the crime scenes." *Floyd v. Vannoy*, Id..

- The severely weakened credibility of Davis' confession due to detectives providing significant details about the crime scenes to Davis, are even further weakened by the numerous discrepancies between Davis' confession and known crime scene facts, including the timing of death discrepancy. Detective Smith admitted these series of critical discrepancies under cross-examination:

Q. During the confession a number of things came up that were other things other than the hours came up that were inconsistent with your investigation. Correct?
A. Just the time I think was the only thing that was the discrepancy.
Q. That was the only discrepancy that you can think of?
A. That and the Medical Examiner's evaluation of the wounds were consistent with only one knife being used.
Q. Okay. In your investigation did you form an opinion as to how many knives were used?
A. I had the opinion that it was only one.
Q. And did you have the opinion it was a knife with one blade or a knife with two blades such as a dagger, two sharp edges?
A. Yes, single edged knife.
Q. So in the confession when Brian Davis tells you that he picked up the dagger that has two sharp edges off the dresser and used that weapon to do the stabbing you knew that that was inconsistent with your investigation. Correct?
A. I felt it could be inconsistent.
Q. Could be. Was there any doubt in your mind at that point as to whether one knife was used or two?
A. Well at the time of the autopsy I didn't  personally evaluate every one of the stab wounds.
Q. You looked at the body yourself?
A. Yeah.
Q. And so in your mind there was a question about one knife or two?
A. I considered it. Yes.
Q. But after the Medical Examiner was done that was eliminated. That's correct. The dagger was eliminated?
A. No, I was not aware of two knives at the time of the autopsy.

Q. What I'm saying is that at the end of your investigation when the Medical Examiner's work was complete and your investigation was complete you knew that only one knife had been used. Correct?

A. I knew that was the Medical Examiner's opinion.

Q. And it was a knife with only one sharp edge?

A. That's correct.

Q. So when Brian Davis says on the confession he originally said he used a dagger with two sharp edges, that was inconsistent. Is that correct?

A. Yes, it was.

Q. So somewhere in the tape you or Detective Hendrix ask to correct him and ask him if some other knife was used?

A. That's correct.

Q. At that point Brian Davis changes his story and says he used two knives?

A. That's correct.

Q. Until you prompted him and said hey, we don't think that's what happened. He was telling you that it all happened with the dagger. Correct?

A. Yes. That's correct.

Q. Brian Davis also told you on the video tape during the confession that there was a stereo by the couch in the living room. Correct?

A. Yes he did.

Q. And there is no stereo by the couch in the living room. Is there?

A. No, there isn't.

Q. The only stereo in the apartment is in the bedroom. Is that correct?

A. That's correct.

Q. Had you ever talked to Brian Davis concerning the writing on the wall prior to making the video tape?

A. I had mentioned it on the 19th when we first met.

Q. What did you say to Brian Davis on the 19th about the writing on the wall?

A. That I wasn't sure if the District Attorney would consider the immunity due to the fact that there was writing on the wall that we suspected Tina had done.

Q. And so in fact when you told the jury earlier today that you went into the video tape room cold, cold meaning you didn't have any prior discussion of the facts with Brian Davis, that wasn't true?

A. I didn't talk to him -- during the testimony was that I didn't talk to him before we went into the room that day.

Q. Okay. But in fact you had talked to Brian about the evidence in the case before the video tape started running. Correct? Right?

A. (sic) You told Brian Davis there was writing on the wall.

A. Yes, I did.

Q. And you told him it was a swastika and the letters NSSH or something like that?

A. No I didn't tell him what it was.

Q. Did you tell him about any other writing?

A. That was it.

Q. What photographs were you showing him during the video tape confession?

A. It would have been a photograph of the victim.

Q. What else?

A. The photograph of the writing on the wall.

Q. Can you tell us about any other inconsistency between your investigation and the confession?

A. In the beginning of the confession he denies that there was writing on the wall. He had no knowledge of it. And I showed him the picture then he agreed that it was there.

Q. Which picture did you show him?

A. The small photograph, the enlargements in evidence.

Q. Is that the picture that shows the whole wall or --

A. The closeup where it shows the swastika and NSSH and the word skinhead with the D dropped off. That's the picture.

ROA.5971-ROA.5976, 1992 Trial 16 RR 2938-2943.

Key Points re: DNA Testing Exonerating Davis

- The DNA testing that has been performed of the three hairs recovered from victim Foster's hands at the crime scene (hairs 1A, 1B, 1C), show mitochondrial DNA profiles of two unknown male contributors, and excluded Davis and McDonald as contributors of the mitochondrial profiles in the hairs. D.E. 30, at 24, ROA.382; Orchid Cellmark DNA Report of Laboratory Examination, ROA.14904-ROA.14905, 2011 Punishment Retrial, Vol 33 DX 11. Two of the hairs (1A, 1B) came from the same contributor based on matching mitochondrial profiles, the other hair (1C) came from a different mitochondrial profile

and therefore a different contributor. Orchid Cellmark DNA Report of Laboratory Examination, Table 1, ROA.14906.

- DNA testing has also been performed on a bloodstain from Foster's jeans (Item 7B-1) believed by the State's 1991 Crime Scene Officer Gail Mills to be a likely vertical blood drop from the knife of the assailant standing over victim Foster as he lay dying on the floor, ROA.11606-ROA.11607, 2011 Punishment Retrial, 17 RR 116-117. DNA testing on the Item 7B-1 bloodstain came back as a mixture of Foster's DNA and at least one other unidentified DNA profile, and again Davis and McDonald were excluded as DNA contributors. ROA.12170-ROA.12171, 2011 Punishment Retrial, 19 RR 210-211 (testimony of Harris County DNA analyst Rhonda Williams); ROA.14487, ROA.14489, Harris County Institute of Forensic Sciences Laboratory Report, 2011 Punishment Retrial State's Exhibit 113, 31 RR SX 113 p.2 (excluding Davis and McDonald as DNA contributors to bloodstain from Foster's jeans (Item 7B-1)).

- Professor of Biology and PhD in Genetics Prof. Greg Hampikian provided his scientific DNA opinion in an affidavit that "there were two critically important DNA results in the defense's favor that were not properly presented to the jury. First, without an expert, the defense was not able to successfully argue that the hairs found in Foster's hand were an important and typical type of DNA evidence processed from a murder victim. Second, the state's experts opined that the bloodstain DNA mixture from the victim's pants (that included one or more unknown persons-not Mr. Davis) was likely contamination. A defense expert would have explained that the unknown DNA profile(s) from the pants, and the hairs from the victim's hand, were all consistent with a theory of two unknown attackers (not Mr. Davis), and that contamination was not indicated." ROA.24424.

- Thus, the DNA evidence tested after Davis's 1992 guilt-innocence trial, is consistent with the eyewitness testimony of Foster neighbor Jeanne Luckey that two white males, neither matching the physical description of Davis or Davis' DNA, were at Foster's apartment the night before his body was found by police Tuesday noon. Professor Hampikian's affidavit based

on further Minifiler and True Allele DNA testing performed after the 2011 punishment retrial explained this conclusion: "13. The second part of my analysis had to do with the DNA evidence from Mr. Davis' trial for the murder of Michael Foster in 1991. The analysis concerns 4 pieces of evidence, a DNA mixture from a bloodstain found on the victim's pants, and three hairs grasped in the victim's hand collected post-mortem. 14. The bloodstain DNA mixture was analyzed using Short Tandem Repeats (STR), and excluded Mr. Davis and his girlfriend Tina McDonald. The DNA mixture consisted of DNA from the victim Mr. Foster, and at least two other unidentified people. The hairs were analyzed using a different type of DNA analysis (mitochondrial) since they lacked roots. From the three hairs, two mitochondrial DNA profiles were obtained indicating two unidentified individuals, and excluding the victim, Mr. Davis, and Ms. McDonald." ROA.24426.

- All four crime scene DNA samples have excluded Davis and McDonald as DNA contributors, and are further proof from the crime scene evidence that Davis was not present at the time Foster was murdered most likely around midnight Monday/early Tuesday morning. As Det. Smith testified at Davis's 1992 trial, there is no physical evidence, eyewitness evidence or fingerprint evidence linking Davis to the Foster murder crime scene, and now no DNA links Davis to the Foster murder scene, while DNA from two unknown males is linked to the Foster murder. Foster neighbor Luckey reported seeing two unknown males knocking on Foster's door the night that the Medical Examiner Dr. Bellas gave as the outside time of death for Mr. Foster, and two Foster neighbors separately reported hearing loud disturbances or a party coming from Foster's apartment late Monday night before his body was found Tuesday at noon: Jean Luckey (ROA.24355-ROA.24356) and Sheryl Theis (ROA.27188). D.E. 30, at 30-31, ROA.388-ROA.389.

Key Points re: Fingerprint Evidence Excluding/Exculpating Davis

- Fingerprints were successfully recovered from the Foster crime scene, but the fingerprints did not match Brian Davis. ROA.11609; 2011 Punishment Retrial, 17 RR 119.

- Possible perpetrators such as Tina McDonald's NSSH Skinhead group including Bryan Falconer, an obscure group that would have been unknown to non-members such as Davis, and whose initials NSSH were left on Foster's apartment wall, and Falconer who matches the physical description given by upstairs neighbor Luckey, together with the totality of other exculpatory DNA, fingerprint and other evidence not linking Davis to the crime scene, allow reasonable jurists to debated that this "created a 'reasonable probability' (less than a preponderance) of shifting even one juror's vote," *Cone v. Bell*, Id., and are thus material under *Brady*.

The above establishes without question that the case for guilt against Brian Davis was decidedly weak. As in *Floyd, supra*, the case hinged on a confession which itself was highly dubious in key respects.

"[W]ithheld evidence is more likely material when the State presents a weaker case for guilt, e.g., *Smith v. Cain*, 565 U.S. 73, 76, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012) (eyewitness "testimony was the only evidence linking [the petitioner] to the crime", and, therefore, the undisclosed statements contradicting this testimony were "plainly material"); *Agurs*, 427 U.S. at 113, 96 S.Ct. 2392 ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.")." *Floyd v. Vannoy*, 894 F.3d at 165-66. Exculpatory evidence is "[e]vidence tending to establish a criminal defendant's innocence," and evidence which "could have helped the defense suggest an alternative perpetrator" is favorable evidence under *Brady*. *Floyd v. Vannoy*, 2017 WL 1837676, at *17-18 (E.D. La. 8 May 2017)(citing *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d

Cir. 2001). "The meaning of the term 'favorable' under *Brady* is not difficult to discern. It is any information in the possession of the government .. . that relates to guilt or punishment and that tends to help the defense bolstering the defense case or impeaching potential prosecution witnesses."). *Floyd*, 2017 WL 1837676, at *18.

> Evidence qualifies as material [under *Brady*] when there is " 'any reasonable likelihood' " it could have " 'affected the judgment of the jury.'" To prevail on his *Brady* claim, [a defendant] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 565 U.S. 73, —— – ——, 132 S.Ct. 627, 629–631, 181 L.Ed.2d 571 (2012) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. Ibid. Wearry can prevail even if…the undisclosed information may not have affected the jury's verdict.

*Wearry v. Cain*, 136 S. Ct. 1002, 1006 and n. 6 (2016). Thus, if there is " 'any reasonable likelihood' " the suppressed evidence could have " 'affected the judgment of the jury'", "even if…the undisclosed information may not have [ultimately] affected the jury's verdict", the suppressed evidence is material under *Brady*. *Wearry*, Id.

The 1992 guilt-innocence jury had no alternative explanation as to who killed Foster except for Davis' factually impossible, contradictory and police-contaminated confession, and the jury therefore might have been willing to overlook the irreconcilable time of death discrepancies, and the wholesale lack of physical evidence tying Davis to the murder scene, given no alternative explanation as to how Foster was killed. While Foster's possessions were found, they were found in Tina

McDonald's possessions taken from her red Camaro, and where McDonald, not Davis, had given instructions to her friend Matt Marquet to take the items. ROA.5730.

According to lead detective Smith during his 1992 trial testimony, all of the eyewitness and physical evidence pointed to Tina McDonald (and her skinhead cohorts) as the murder perpetrator of victim Foster, and the objective evidence did not link Davis to the crime:

> Q. You never told her [Tina McDonald] that you didn't have anything against Brian Davis. A [Humble PD Det. Smith] Yes, I did. **Q. What did you tell her? A. I told her that all the evidence was pointed towards her in the case. Q. What did you tell her about Brian Davis? A. That none of the evidence was linking Brian Davis to the crime.** Q. So the impression you were giving her was that if somebody was going to die in this case, it was Tina McDonald and not Brian Davis? A. No, I never told her that. Q. You told her it was a capital case? A. Yes, I did. **Q. You told her the evidence did not link Brian Davis to it? A. That's correct.** Q. Based on that, you wouldn't be surprised if she got the impression if this case got filed, she would be the person facing execution? A. No, I never told her that. Q. You knew that Tina McDonald was communicating with Brian Davis. Correct? A. I was told they were writing, yes. Q. And you also know from Deputy Strickland that Deputy Strickland was setting up phone calls after your visits where Tina was allowed to report to Brian what you were telling to Tina? A. No, I was not aware of that. Q. Prior to today, you had never heard that Deputy Strickland had allowed the two of them to talk over the phone? A. I heard it, but I don't think I heard it from Deputy Strickland. **Q. Okay. So you heard that Tina was in a position to relay what you tell Tina to Brian Davis. Correct? A. I suspected it. Yes.**

ROA.2890-ROA.2891, 1992 Trial, 2 RR 161-62, quoted in ROA.370-ROA.371, D.E. 30, at 12-13.

Tina McDonald thus had multiple opportunities over several months while both were incarcerated in Harris County Jail to provide crime scene details to Davis. According to Harris County Sheriff's Office jailer Strickland, Strickland allowed Brian Davis to call his wife McDonald four times on the telephone while both were jailed at Harris County Jail before Brian Davis confessed. ROA.2813-ROA.2814, 1992 Trial, 2 RR 84-85, quoted in ROA.392-ROA.393, D.E. 30, at 34-35.

Thus, Tina McDonald was in a position on multiple occasions to transmit her knowledge of details from the Foster crime scene to Brian Davis, in order that Brian Davis, as HCSO jailer Deputy Strickland testified, could engage in "the chivalry thing and trying to protect Tina, trying to keep her out of the business, out of the situation." ROA.2817, 1992 Trial, 2 RR 88. Tina McDonald also stated that Davis and she were given privileges other inmates were not allowed, such as being allowed to talk on the phone together and were allowed to sit next to each other while waiting for court hearings. "After each visit with the detective I would go back to my cell and write Brian about everything that was being said. I let Brian know that all the evidence was pointing at me and not him and that I was getting scared. Brian and I were given privileges that other inmates weren't. Strickland would allow Brian and I to talk on the phone. This happened six or seven times. We were allowed to sit next to each outside the court room. We had the opportunity to talk about what the detectives were telling me outside the court room." See ROA.20285- ROA.20286,

D.E. 30, Exhibit 2, (2012 State Successor Writ G, Ex. 29 [3/30/00 Aff. of Tina McDonald]; ROA.20289- ROA.20291, Ex. 30 [9/29/00 Aff. of Tina McDonald])(McDonald admits McDonald and Foster left Davis alone at the Red Coach motel room, and McDonald travelled alone to Foster's apartment and killed Foster after Foster put his hands on McDonald). Thus, Brian Davis had multiple opportunities over several months to learn details of the Foster crime scene from Tina McDonald, in order to falsely confess to the Foster murder, exculpate his wife, and thus attempt to protect his wife from the penitentiary and McDonald's recently-born infant daughter from being raised without a mother. The fact that Davis made so many errors in recounting accurate details from the crime scene, while getting some details right, is indicative of a false confession, with details given to Davis by McDonald and Detective Smith, particularly given that no witness testimony, fingerprint evidence, or DNA evidence tested to date links Davis to the Foster crime scene, and in fact link other as-yet unidentified perpetrators to the crime scene.

Reasonable jurists could debate whether the District Court erred by wholly disregarding the view of petitioner's trial counsel Scott on the suppression, favorability and materiality of the suppressed evidence to the defense case. "In speculating that the undisclosed polygraph results might have affected trial counsel's preparation, and hence the result at trial, the Ninth Circuit disagreed with, or

disregarded, the view of respondent's own trial counsel." *Wood v. Bartholomew*, 516

U.S. 1, 6-7, 133 L.Ed. 2d 1, 116 S.Ct. 7 (1995).

Reasonable jurists could debate whether the District Court erred to wholly

ignore and failed to evaluate or credit, even partially, Davis' 1991 trial counsel Bob

Scott's affidavit that demonstrated the suppression, favorability and materiality of

the suppressed information to the defense case he presented:

> 6. At no time did the state provide the defense offense reports or bring to the Defenses' attention information relating to Tina McDonald's involvement in so called home invasions, assault crimes, nor did the State inform the Defense that such home invasions were done in concert with members of skinhead groups or other members of white supremacist organizations.
> 8. Both the quid pro quo and the *Brady* information regarding Tina McDonald's other criminal activity were critical to the defense in that the defense always sought to suppress Mr. Davis' confession believing it to be based on a quid pro quo in exchange for immunity for Tina McDonald, involuntary, and false, and believed that Mr. Davis did not commit the Foster murder but simply confessed to protect his then wife Tina McDonald. The Home invasions conducted by Ms. McDonald would have clearly provided the defense an alternate theory as to the actual person or persons who committed the Foster murder because of the skinhead writings found on Foster's apartment wall, and physical evidence linking Tina McDonald to Foster's murder. There was no physical evidence connecting Mr. Davis to the Murder of Mr. Foster, Mr. Davis' confession was therefore the key piece of evidence against Mr. Davis, as our defense at trial was that Mr. Davis falsely confessed to the Foster murder in exchange for immunity from prosecution for his then-wife Tina McDonald. Both of the above categories of evidence that were withheld form the defense by the State would have been extremely helpful in presenting Mr. Davis' defense and would likely have resulted in his acquittal.

Affidavit of Bob Scott, 1992 Trial Counsel. ROA.24483- ROA.24484.

For all of the above reasons, reasonable jurists could debate the district court's resolution of the *Brady* claim here, including the *Brady* elements of suppression, favorability, and whether there is " 'any reasonable likelihood' the suppressed *Brady* evidence "could have " 'affected the judgment of the jury'", "even if…the undisclosed information may not have affected the jury's verdict", *Wearry*, Id., and is thus material under *Brady*.

Reasonable jurists could also conclude that the lack of any reliable physical evidence that Mr. Davis murdered Michael Foster would have had obvious exculpatory and mitigating value during the capital sentencing proceeding. Thus, in the unlikely event that Mr. Davis would still have been convicted of capital murder, reasonable jurists could find a reasonable probability of a different sentencing outcome, given the absence of any reliable physical evidence that Davis murdered Foster, and the impossibility of Davis' confession being reliable.

## II.    False Evidence Rendered Mr. Davis' Capital Sentencing Trial Unconstitutional

### A. Relevant Facts

(1) Trial evidence

At Mr. Davis' capital re-sentencing trial in 2011, the State sought to implicate Mr. Davis in a 1988 homicide of Keith Blaylock at a Beverage Barn in Mineral Wells, Texas. Mr. Davis had never been charged in this matter, nor had he ever been

identified as a suspect in that case.[9] The State's primary evidence supposedly connecting Mr. Davis to the Blaylock homicide was two-fold: the highly discredited testimony of State's witness David Cason, an admitted participant in the Blaylock homicide, and DNA evidence from DPS analyst Uyen Henson, who testified that to a high degree of probability, Mr. Davis could not be excluded from a mixed DNA sample obtained from a stocking cap found at the scene of Mr. Blaylock's death, and Cason was excluded as a contributor of DNA to the stocking cap.

As to David Cason, he was an admittedly poor witness for the State, and was heavily impeached with inconsistencies in his various statements over the years, ROA.13300- ROA.13301, ROA.13308, 2011 Punishment Retrial, 24 RR 22-23, 30. In the first place, Cason waited fifteen years to come forward with information about the Blaylock homicide, and then only in exchange for complete immunity. ROA.13030, 2011 punishment retrial, 23 RR 34 (Cason demanding full immunity), ROA.14225, 2011 punishment retrial, 28 RR 57 (Cason waited fifteen years to come forward).

Moreover, at the time of the Blaylock homicide in 1988, Cason was both selling and using methamphetamine and marijuana on a daily basis. ROA.13213-ROA.13215, 2011 Punishment Retrial, 23 RR 217-219; ROA.13300- ROA.13301,

---

[9] The primary suspect in the case was Tyler Strader, who died in a separate incident not long after the Blaylock homicide.

ROA.13308, 2011 Punishment Retrial, 24 RR 22-23, 30. By the time of his 2011 testimony, Cason was a twice-convicted felon and seasoned penitentiary inmate, ROA.13212- ROA.13217, 2011 Punishment Retrial, 23 RR 216-21.

Cason was also impeached as to his motives, as well as the motive of his cousin (who himself informed police Cason told him about the Blaylock homicide), both of whom actively sought and received immunity deals for their testimony against Davis and Cason, respectively. ROA.13325, 2011 Punishment Retrial, 24 RR 47 (Cason was seeking and received immunity for capital murder in exchange for his testimony against Davis) ROA.13327, 2011 Punishment Retrial, 24 RR 49 (cousin was seeking leniency for his testimony against Cason).

Perhaps the clearest indication of the critical importance of the now-recanted Blaylock murder DNA evidence to establishing a case against Davis is the fact that the then-pending capital murder prosecution of Davis for the Blaylock murder was voluntarily dismissed by the State within weeks of the DPS DNA Lab recanting of its DNA evidence in the Blaylock murder. ROA.468 (citing Exhibit 7, Order Dismissing Blaylock Murder Indictment dated May 9, 2017). Previously the prosecutor Mitchell had written in 2011: "We were able to successfully prove to our jury that Brian Davis murdered Keith Blaylock and we obtained a swift death sentence for the defendant." ROA.632 (citing Exhibit 35). Without the DPS DNA Lab conclusions about the Blaylock stocking mask connecting Davis to the Blaylock

murder, the State felt it could not prevail in a case based upon the other evidence linking Davis to the Blaylock murder, particularly given the strong evidence pointing towards the deceased Tyler Strader being the murderer of Blaylock, including multiple witnesses testifying to hearing Strader's confession on different occasions to committing the Blaylock murder, all of which were heavily disputed at Davis' 2011 punishment retrial. ROA.14227, 2011 punishment retrial, 28 RR 59.

### B. Post-conviction recantation of DNA evidence

On April 12, 2017 the Texas Department of Public Safety ["DPS"] issued a letter recanting the trial testimony and evidence provided by analyst DNA analyst Henson at Mr. Davis' 2011 re-sentencing trial. Prior to the issuance of that letter, in 2015 the Texas Forensic Science Commission ["TFSC"] had sent out an advisory to Texas attorneys and courts regarding significant changes in interpretation protocols for DNA evidence from mixed samples containing DNA profiles from more than one person. ROA.24055-ROA.24058, Exh. 1 to State Writ-I. The advisory noted that "changes in mixture interpretation have occurred primarily over the last 5-10 years and were prompted by several factors, including but not limited to mixture interpretation guidance issue in 2010 by the Scientific Working Group on DNA Analysis." *Id.* The TFSC advisory recommended that attorneys – prosecutors and defense attorneys -- seek a re-calculation of the probabilities of inclusion/exclusion in any case in which the lab conducting the testing had not relied

upon the currently accepted protocols for such mixture evidence. *Id.* "The potential range of interpretive issues has yet to be assessed," the TFSC advisory notes, "but the potential impact on criminal cases raises concerns for both scientists and lawyers." *Id.*

In light of this 2015 TFSC advisory and the Harris County prosecutor's invitation for DNA mixture re-analysis, ROA.24055, then-state habeas counsel for Mr. Davis sought re-analysis, or "re-interpretation" as that term is known in DNA testing, of the Blaylock homicide DNA evidence relied upon by the State at Mr. Davis' 2011 resentencing trial via letter to the Harris County District Attorney's Office. ROA.24117-ROA.24120. After substantial delays and repeated inquiries, the DPS DNA section eventually issued an amended DNA report and memo, dated April 12 (ROA.24462) and April 28, 2017 (ROA.24465), respectively. In this updated report and memo, DPS retracted its findings in the case, thereby undermining the entirety of the DNA evidence used at Mr. Davis' resentencing trial as false and unreliable. ROA.24465-ROA.24467.

First, DPS retracted its claim that the evidence in the case was *not* contaminated, instead admitting that there was *clear evidence of contamination* found in the reagent blank used as a control to detect such issues. This conclusion directly contradicts the testimony of DPS analyst Henson, who claimed no evidence of contamination existed. ROA.13206, 22011 punishment retrial, 23 RR 210.

Second, DPS retracted its claim that State's witness Cason could be excluded from the DNA evidence found on the stocking cap. In fact Mr. Cason could *not* be excluded from the mixed sample tested. This too contradicted analyst Henson's 2011 trial testimony. ROA.13162, 2011 punishment retrial, 23 RR 166.

Finally and most critically, DPS retracted its testimony linking Mr. Davis to the stocking cap. Instead, after further review of the evidence utilizing the updated DNA testing protocols, DPS found that, because of the number of potential contributors to the DNA found on the stocking cap, namely at least five, the "mixture is now too complex" for *any* reliable interpretation. In short, no DNA link could reliably be established from the stocking cap connecting Mr. Davis to the Blaylock homicide, and thus the trial testimony given by DNA analyst Henson was erroneous and false. ROA. 13162, 2011 punishment retrial, 23 RR 166.

These new DNA conclusions were of "great concern" to DNA expert Prof. Hampikian, who explained in plain language in his affidavit that they "cast serious doubt on Mr. Davis' conviction ..." ROA.24423- ROA.24428. In the first place and to be clear about the status of the trial record, Dr. Hampikian noted that analyst Henson's testimony was DNA "match" testimony, namely, that the stocking cap DNA "matched Mr. Davis with a match statistic of 1 in 758,200 Caucasians." *Id.* Second, Dr. Hampikian confirmed that the new DPS conclusions contradicted the trial testimony from DPS analyst Henson regarding the possibility of any

contamination in the case. *Id*. Third and most importantly, Dr. Hampikian underscored that the new DPS findings in the Davis case made plain that "the lab was no longer standing by its conclusions ...  The Texas DPS State Crime Laboratory has therefore retracted its conclusions regarding this crucial DNA evidence that had been shared with the Court during Mr. Davis' sentencing." ROA.24425.

In short, whereas at trial the State presented and relied heavily upon DNA evidence supposedly linking Mr. Davis to an unsolved, uncharged, decades-old homicide, the post-trial record contains undisputed scientific evidence -- emanating from the same agency that conducted the original testing for the 2011 trial -- that this evidence was false and unreliable.

## C. Applicable Legal Principles and Standard of Review

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the U.S. Supreme Court held that a death sentence based on "materially inaccurate" evidence violates the Eighth Amendment. In *Johnson* the Court found that the prosecution's reliance on a prior New York conviction at the defendant's capital sentencing trial that was later overturned on constitutional grounds rendered the capital sentencing trial itself unconstitutional. *Id.*

## D. Prejudice

In the *Johnson* case the Court overturned the defendant's capital trial without applying a standard of prejudice or harm. That case arose on appeal to the U.S. Supreme Court from state post-conviction proceedings.

Although the Court in *Johnson* did not apply a harmless error analysis, subsequent cases have held that in analyzing *Johnson*-type error in federal habeas proceedings, such error subject to the harm standard set forth in *Brecht v. Abrahamson*, namely, whether the error had a "substantial and injurious effect" on the trial proceedings. *Brecht v. Abramson*, 507 U.S. 619 (1993); *Simmons v. Epps*, 654 F.3d 526, 537-42 (5th Cir. 2011); *Hughes v. Quarterman*, 530 F.3d 336, 345-46 (5th Cir. 2008).

Because Appellant here seeks a Certificate of Appealability on this issue, he need only show that the question of whether there exists harmful *Johnson* error in this case is "debatable among jurists of reason." As can be readily demonstrated, it is far beyond reasonable debate that, given the State's heavy reliance upon the DNA evidence in the case to establish that Mr. Davis was supposedly a double-murderer, this false evidence and testimony had a substantial impact on the trial outcome.

The State relied heavily upon the allegation that Mr. Davis participated in the Blaylock homicide in its case for a sentence of death. The closings arguments of the prosecution are replete with full-throated discussions of the details of the Blaylock homicide, expressly relying upon Mr. Davis' alleged involvement in it to urge the

jury to conclude that someone who had committed two murders (including the case-in-chief) was both dangerous and not deserving of mercy.

Throughout its closing argument the State was absolutely unsparing in its focus on the specific and admittedly tragic facts of the Blaylock homicide, describing Davis' alleged involvement as a "reign of terror":

> Can you imagine having to go to bed every night knowing that your child was kidnapped and robbed, the money was already taken, but because he went to school with the one that did it, he was kidnapped, driven out to a dark road, marched out into a field, put on his knees and shot in the back of the head. That's a parent's tough life. That's who we should be feeling sorry for.

ROA.14259, 2011 Punishment Retrial, 28 RR 91.

> And remember Keith Blaylock. Nineteen years old. Graduated from high school. Finish his first year of college. Coaching Little League. Working. Closes up the business, as he had many times. And the defendant comes in and he's got a stocking mask, but Keith recognizes him. And the next thing Keith knows, he's being taken out to a deserted, remote dark, dark road and he is being put down on his knees. He's down on his knees in front of the man who he knows is going to kill him. And he's got the muzzle, the muzzle of the gun against the back of his neck. Can you just imagine what was going through his mind? You know you knew he was going to die. And you know from Dr. Bernard that he was screaming for his life, for his mom. We'll never know.
> But what we do know is that there is only one just verdict in this case. What we do know is that that day has come, that time has come, the time to end the reign of terror of Brian Edward Davis.

ROA.14275- ROA.14276, 2011 Punishment Retrial, 28 RR 107-08.

The State emphasized that someone who had committed more than a single murder is far more deserving of death because of that fact:

If this is not a case for the death penalty, then there's not going to be one. ... How many people does he have to kill?

And if he doesn't get the death penalty, how many more people will be harmed or otherwise injured by Brian Davis?
In this courtroom today is one family that has waited almost 20 years for this day and another that has waited more than 20. And today is the day that they are looking to you for justice.

ROA.14249- ROA.14250, 2011 Punishment Retrial, 28 RR 81-82.

The State argued that Mr. Davis' supposed involvement in this "reign of terror" undermined whatever mitigation evidence the defense attempted to present:

Mr. Tanner also told you the kitchen sink was going to be thrown in here, and it was, by them by what they call their mitigation. And we don't challenge that the defendant had a learning disability. We don't challenge that he had difficulty reading. We don't challenge that he had an unstable home life. But remember what Mr. Long told you, the bar has been set very, very high as to what is a sufficient mitigating circumstance to overcome the reign of terror that you've heard about.

       \*     \*     \*

The choice he made is to take the last breath out of two people. The choice he made is to tie up people and torture them. The choice he made is to continue a life of crime. And when we talk about mitigation, it has to be in light of that.

ROA.14262- ROA.14263, ROA.14267, 2011 Punishment Retrial, 28 RR 94-95, 99.

Importantly here, the DNA evidence was the lynchpin of the State's case against Mr. Davis in the Blaylock homicide. When it came to discussing the actual evidence of Mr. Davis' alleged participation in the Blaylock homicide, the State addressed the admittedly questionable testimony of Cason by pointing to the

scientific certainty of the DNA evidence excluding Cason but including Davis as a contributor of DNA to the stocking mask retrieved from the crime scene:

> And it all started with Keith Alan Blaylock in Mineral Wells, Texas in 1988 where the defendant went when he absconded from his probation out of Tarrant County. And ask yourself as you think about what Mr. Cornelius said about David Cason and his flimsy DNA evidence…. Who? The same one whose DNA is on the stocking mask that David Cason didn't even know was left behind when he spoke to the police in 2003. One in 782,000 people. That's what Mr. Cornelius calls flimsy DNA evidence. I don't even know how many more times that is than the entire population of Mineral Wells, Texas in 1988. 17,000 was the population of Mineral Wells. One in 782,000.

ROA.14270- ROA.14271, 2011 Punishment Retrial, 28 RR 102-103.

Given the critical role of the State's allegations regarding Davis' alleged involvement in the Blaylock homicide at the 2011 re-sentencing trial, there can be no doubt that the State's presentation of and express reliance upon this false evidence produced "grave doubt about whether a trial error of federal law had 'substantial and injurious effect' on the trial outcome, requiring reversal of the death sentence. *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

And it is beyond dispute that there is at least a reasonable debate about whether such false, prejudicial evidence had a highly prejudicial impact on the trial outcome.

### E. The District Court Erred in Several Important Respects

After questioning whether Mr. Davis even raised this issue as a *Johnson* claim, D.Ct. opinion at 65-66,[10] the court below queried whether *Johnson* was even applicable to the facts as alleged here. *Id.* The court asserted Mr. Davis had cited "no precedent" for the application of *Johnson* to any cases other than those involving the use of a prior, invalid conviction at the sentencing phase of a capital trial. *Id.*

In fact Mr. Davis not only relied on *Johnson* in his claim involving the false and unreliable DNA evidence used at the 2011 re-sentencing trial, he cited U.S. Supreme Court case law applying *Johnson* to "materially inaccurate evidence" used in a capital sentencing context. *See Tuggle v Netherland*, 516 U.S. 10, 14, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995):

> Although our holding in *Zant* supports the conclusion that the invalidation of one aggravator does not necessarily require that a death sentence be set aside, that holding does not support the quite different proposition that the existence of a valid aggravator always excuses a constitutional error in the admission or exclusion of evidence. The latter circumstance is more akin to the situation in *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), in which we held that *Zant* does not apply to support a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence, id., at 590, 108 S.Ct., at 1988, than to *Zant* itself. Because the Court of Appeals misapplied *Zant* in this case, its judgment must be vacated.

*Id.*; ROA.2287- ROA.2288, D.E. 95, at 42-43 (quoting same language from *Tuggle* on same). The "materially inaccurate evidence" evidence in *Tuggle* was the State's

---

[10] The lower court was in error in raising that question, as Mr. Davis expressly relied upon *Johnson* and cited it in his Federal Petition, D.E. 30 at 108 (citing *Johnson v. Mississippi*) (ROA.466) and his Reply in support of this claim. D.E. 95, Reply, at 42-43 (ROA.2287- ROA.2288) (citing *Johnson* and *Tuggle*).

unrebutted psychiatric testimony at the sentencing phase of trial that petitioner demonstrated "a high probability of future dangerousness." *id.* at 11, which was declared inadmissible because Tuggle had been denied the assistance of an independent defense psychiatrist to rebut the state's psychiatric evidence. The *Tuggle* Supreme Court applied *Johnson* to the *Ake* error, showing *Johnson* is not limited merely to invalid conviction evidence, but rather to any "materially inaccurate evidence."[11]

In its discussion of the question of prejudice, the District Court mischaracterized both the nature of the trial DNA evidence regarding the Blaylock homicide, as well as the conclusions reached by DPS in its 2017 retraction of that evidence. ROA.2468, DE 99, D.Ct. opinion at 66. The lower court found that "the jury would see little difference between testimony about testing results that could not exclude Davis as a contributor to the DNA and testimony that the DNA was untestable." (ROA.2469, DE 99 at 67). As pointed out above and as supported by the expert affidavit of Dr. Hampikian, the trial testimony indicated there was a high probability match of Davis' DNA to that found on the stocking cap. The State certainly understood the trial testimony in this stark and prejudicial manner, arguing

---

[11] The District Court also asserted that under *Johnson*, the falsity of evidence presented at a capital sentencing trial must be determined as of the time of trial, DE 99 at 66 (ROA.2468). But the prior conviction used in *Johnson* itself was valid at the time of the capital sentencing in that case, and was only invalidated well after trial in state post-conviction proceedings. The Supreme Court nonetheless granted relief in *Johnson*, thus making clear that a rule limiting relief to false evidence only if it was shown to be false at the time of the capital sentencing proceeding violates the rule in *Johnson* itself.

repeatedly that analyst Henson's DNA results conclusively demonstrated Davis was involved in the Blaylock homicide. Supra.

The Court also mis-stated the conclusions reached by DPS in its 2017 re-assessment of the case. Again, as Dr. Hampikian makes clear, the 2017 retraction was not just that the evidence was "untestable", as the District Court found, but rather that it was tested, and was found not only to have contamination issues, but also that it could not be relied upon either to include Davis or to exclude Cason. In short, whereas at trial Davis' DNA was purportedly a match to the stocking cap DNA, the 2017 re-assessment retracts those conclusions, indicating that Davis' could not be matched to the stocking cap, nor even included as a possible contributor. The difference here is literally black and white, and the District Court's failure to register this understanding critically undermines its findings on prejudice.

Perhaps most troubling, the District Court found that "[t]he 2017 reassessment left Davis in much the same position as he was in the second punishment hearing – no DNA definitively connected him to the stocking mask, but Cason's testimony did." (ROA.2469, DE 99, at 67). That is simply belied by the record in this case. In fact the trial record demonstrates just the opposite: when confronted with the myriad problems and holes in Cason's testimony, the State did not attempt to rehabilitate Cason so much as it just pivoted to the DNA evidence, claiming that regardless of whether Cason was credible, Davis was indeed

"definitively connected" to the mask by the DNA evidence and therefore to the Blaylock homicide. *See supra*, citing ROA.14270- ROA.14271, 2011 Punishment Retrial, 28 RR 102-103.

Finally, in concluding that there was insufficient prejudice arising from the *Johnson* error in this case, the Court also reviewed other aggravating evidence relied upon by the State at the resentencing trial, in addition to the case-in-chief. (ROA.2469-ROA.2470, D.E. 99, at 67-68). *But see* supra at 18 (*Brady* materiality section)

Even the State acknowledged, however, that Davis' life was far from healthy or even normal. No one disputes that Mr. Davis certainly had a disturbingly troubled history as a young child and throughout his early life, as evidenced by the significant mitigation presented at trial. As the trial record shows, Mr. Davis came from a chaotic, unstable home, his parents having been married and divorced four separate times, with Davis continually moving around the country and in and out of living between his father and his mother's residences.

Critically on the issue of Mr. Davis' acts of violence, his childhood family was torn apart by severe and repeated violent episodes, by a father who had served two tours in Vietnam as a Marine, but came back from the war damaged and prone to horrendous outbursts of rage at his own family, beating his wife and his son repeatedly and severely. The father constantly brandished firearms in front of the

family to settle personal disputes with the mother's boyfriend and a second husband. ROA. 14241, 2011 punishment retrial, 28 RR 68 et seq. Davis' father whipped his son severely for spitting in a little girl's face (a fact that was later learned to be untrue). ROA.14240, 2011 punishment retrial, 28 RR 72. Davis was also so learning disabled that he was unable to read as a child. ROA.14244, 2011 punishment retrial, 28 RR 76. In addressing this evidence, the State in closing once again pivoted away from its undeniably mitigating nature, by referencing and relying upon Davis' alleged involvement in the Blaylock homicide, a second murder, perpetrating a "reign of terror," *with express reference to* the certitude evidenced by the gold standard itself -- DNA evidence – directly linking Mr. Davis to the crime. ROA.14270- ROA.14271, 2011 Punishment Retrial, 28 RR 102-103. Undermining the DNA evidence in the case itself wholly undermines the State's case against the case for mitigation, a fact the District Court fails to mention or address.

## CONCLUSION

For the foregoing reasons, undersigned counsel respectfully urge the Court to grant a Certificate of Appealability on the claims presented herein.

Respectfully submitted,
McGuire Law Firm

BY:   */s/ Ken McGuire*
      Kenneth W. McGuire
      Federal Admission No. 21917
      State Bar No. 00798361
      P.O. Box 79535
      Houston, TX 77279
      Telephone:  (713) 223-1558
      Facsimile:    (713) 335-3340

      ATTORNEY for PETITIONER
      BRIAN EDWARD DAVIS

**CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS**

I certify that, on January 31, 2025, the foregoing motion was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, in full compliance with ECF filing standards, upon the following registered CM/ECF users:

Jacey Winget
Office of the Attorney General
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548
Phone: 512-463-2029
Fax:      512-936-1280
Jacey.Winget@oag.texas.gov

Counsel further certifies that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: _____January 31st_____, 2025.

/s/ *Ken McGuire*
Kenneth McGuire

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 16,711 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii). Counsel will be filing a motion for brief in excess word count to comply with this Rule.

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in 14 pt. Baskerville.

*/s/ Ken McGuire*
Kenneth McGuire