No. 24-70006

IN THE
United States Court of Appeals for the Fifth Circuit

BRIAN EDWARD DAVIS,
*Petitioner–Appellant,*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,
*Respondent–Appellee.*

On Appeal from the United States District Court for the Southern
District of Texas, Houston Division, Cause No. 4:16-cv-1867

**RESPONSE IN OPPOSITION TO MOTION FOR A
CERTIFICATE OF APPEALABILITY**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals

JACEY WINGET
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936–1400
jacey.winget@oag.texas.gov

*Counsel for Respondent–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Respondent–Appellee*
> Eric Guerrero, Director
> TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent–Appellee*
> Jacey Winget, Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
> Brian Edward Davis

*Counsel for Petitioner–Appellant*
> Kenneth W. McGuire
> MCGUIRE LAW FIRM

> s/ Jacey Winget
> JACEY WINGET
> Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2)(C), oral argument should be denied because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF CONTENTS .........................................................................iii

TABLE OF AUTHORITIES .................................................................... v

INTRODUCTION............................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES.......................................................... 1

STATEMENT OF THE CASE ............................................................... 2

   I.   Procedural History...................................................... 2

   II.   Statement of Facts...................................................... 7

      A. The State's Case for Guilt ................................... 7

      B. Davis's 1992 Trial ............................................. 10

      C. Davis's 2011 Punishment Retrial................................ 11

SUMMARY OF THE ARGUMENT ....................................................... 13

STANDARD OF REVIEW...................................................................... 13

ARGUMENT ........................................................................................ 14

   I.   Davis's Claims Challenging His 1992 Conviction Are Successive ................................................................... 14

   II.   The District Court's Rejection of Davis's *Brady* Claim Is Not Debatable .................................................. 26

A.    Davis's Brady claim is untimely ................................... 26

B.    Factual background .................................................... 29

C.    The district court's rejection of this claim is not debatable .................................................................... 29

III.    The District Court's Rejection of Davis's False Testimony Claim Is Not Debatable ............................................... 35

A.    Factual background .................................................... 35

B.    The relevant standards ............................................... 44

C.    Davis's claim is procedurally defaulted ...................... 46

D.    The district court's rejection of this claim is not debatable .................................................................... 53

CONCLUSION ................................................................. 62

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................... 63

CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS ................................................................. 63

CERTIFICATE OF SERVICE ............................................... 64

# TABLE OF AUTHORITIES

**Cases**        **Page**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) .................................16, 25

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ....................................................57

*Anderson v. Harless*, 459 U.S. 4 (1982).................................................51

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................4, 5, 6, 7

*Banks v. Dretke*, 540 U.S. 668 (2004).....................................................30

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000)............................14

*Beatty v. Stephens*, 759 F.3d 455 (5th Cir. 2014)..................................52

*Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018)..................................17

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................Passim

*Brown v. Lensing*, 171 F.3d 1031 (5th Cir. 1999)..................................17

*Buck v. Davis*, 580 U.S. 100 (2017) ........................................................13

*Burton v. Stewart*, 549 U.S. 147 (2007) ...............................17, 21, 22, 23

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014)........................Passim

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ........................................61

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..........................................52

*Davis v. Texas*, 580 U.S. 1057 (2017).......................................................6

*Duncan v. Henry*, 513 U.S. 364 (1995)..................................20, 23, 25, 60

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) ....................52

*Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012) ....................52

*Ex parte Davis*, 2009 WL 3839065 (Tex. Crim. App. Nov. 18, 2009) .......5

*Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996) ......................52

*Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996)..................................44

*Felker v. Turpin*, 518 U.S. 651 (1996)...................................................16

*Giglio v. United States*, 405 U.S. 150 (1972) .................................Passim

*Gonzales v. Davis*, 924 F.3d 236 (5th Cir. 2019)..............................14, 25

*Hardemon v. Quarterman*, 516 F.3d 272 (5th Cir. 2008) .......................25

*Harrington v. Richter*, 562 U.S. 86 (2011) .............................................14

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000) ............................57

*Hogue v. Johnson*, 131 F.3d 466 (5th Cir. 1997)....................................61

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ...........................59

*In re Cain*, 137 F.3d 234 (5th Cir. 1998)................................................25

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) ...........................................16

*In re Davila*, 888 F.3d 179 (5th Cir. 2018)............................................50

*In re Davis*, 535 U.S. 1050 (2002) ..........................................................3

*In re Greenwood*, 2022 WL 501393 (5th Cir. Feb. 18, 2022) ...........17, 18

*In re Hensley*, 836 F.3d 504 (5th Cir. 2016)...........................................19

*In re Lampton*, 667 F.3d 585 (5th Cir. 2012) .........................................19

*In re Parker*, 575 F. App'x 415 (5th Cir. July 16, 2014) .................. 20, 23

*Johnson v. Mississippi*, 486 U.S. 578 (1988) .................................... 45, 50

*Johnson v. United States*, 623 F.3d 41 (2d Cir. 2010) ........................... 24

*Kelly v. Cockrell*, 72 F. App'x 67 (5th Cir. 2003) .................................. 60

*Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002) ................................ 54

*Magwood v. Patterson*, 561 U.S. 320 (2010) ..................................... 17, 22

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .......................................... 28

*Miller v. Alabama*, 567 U.S. 460 (2012) ................................................ 18

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ........................................... 13

*Montgomery v. Louisiana*, 577 U.S. 190 (2016) .................................... 18

*Moore v. Dretke*, 369 F.3d 844 (5th Cir. 2004) ..................................... 17

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................. 44

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) .................................. 51

*Pierre v. Vannoy*, 891 F.3d 224 (5th Cir. 2018) ............................... 44, 45

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998) .................................... 44

*Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007) .......................... 51, 56

*Reed v. Stephens*, 650 F.3d 753 (5th Cir. 2014) .................................... 32

*Ricks v. Lumpkin*, 120 F.4th 1287 (5th Cir. 2024) ................................ 26

*Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010) ..................................... 50

*Romano v. Oklahoma*, 512 U.S. 1 (1994) .............................................. 61

*Scott v. Hubert*, 635 F.3d 659 (5th Cir. 2011) .........................................21

*Shinn v. Martinez Ramirez*, 596 U.S. 366 (2022) ..................................25

*Slack v. McDaniel*, 529 U.S. 473 (2000) .................................................14

*Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996) ....................................60

*Strickler v. Greene*, 527 U.S. 263 (1999) ...............................................30

*Suggs v. United States*, 705 F.3d 279 (7th Cir. 2013) ...........................23

*Teague v. Lane*, 489 U.S. 288 (1989) .....................................................54

*Tuggle v. Netherland*, 516 U.S. 10 (1995) .......................................57, 58

*United States v. Agurs*, 427 U.S. 97 (1976) ...........................................45

*United States v. Bagley*, 473 U.S. 667 (1985) ..................................30, 34

*United States v. Jones*, 796 F.3d 483 (5th Cir. 2015) ...........................19

*Velez v. State*, AP-76,051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012) ........................................................................................................60

*Wentzell v. Neven*, 674 F.3d 1124 (9th Cir. 2012) .................................24

*White v. Woodall*, 572 U.S. 415 (2014) ..................................................57

*Zant v. Stephens*, 462 U.S. 862 (1983) ..................................................58

**Statutes and Rules**

18 U.S.C. § 3582(c)(2) ..............................................................................19

28 U.S.C. § 2244(b) .............................................................................21, 24

28 U.S.C. § 2244(b)(1)–(2) .......................................................................24

28 U.S.C. § 2244(b)(2)(A)–(B) ................................................................ 16

28 U.S.C. § 2244(b)(2)(B) ..................................................................... 17

28 U.S.C. § 2244(b)(2)(B)(ii) ................................................................ 17

28 U.S.C. § 2244(b)(3) ..................................................................... 15, 17

28 U.S.C. § 2244(b)(3)(A) ..................................................................... 16

28 U.S.C. § 2244(b)(4) ......................................................................... 17

28 U.S.C. § 2244(d)(1)(B), (D) ............................................................... 27

28 U.S.C. § 2254(b)(1)(A) ..................................................................... 51

28 U.S.C. § 2244(d) ........................................................................ 21, 27

28 U.S.C. § 2254(d) ........................................................................ 48, 57

28 U.S.C. § 2244(d)(2) ......................................................................... 28

28 U.S.C. §§ 2253(c)(1)(A), (c)(2) ............................................................. 1

Tex. Code Crim. Proc. art. 11.071 § 5 ............................................... Passim

# INTRODUCTION

Petitioner–Appellant Brian Edward Davis was convicted of capital murder and sentenced to death for the murder of Michael Foster. Davis filed a federal habeas petition that raised numerous claims challenging his conviction and sentence. The district court denied all of Davis's claims and a certificate of appealability (COA). Davis now seeks a COA from this Court. *See generally* Mot. for COA (Mot.). Because no reasonable jurist could disagree with the lower court's decision, this Court should deny Davis's request for a COA.

# STATEMENT OF JURISDICTION

Absent the jurisdictional defect discussed below, *see* Argument, Part I.A, *infra*, this Court has jurisdiction pursuant to 28 U.S.C. §§ 2253(c)(1)(A), (c)(2).

# STATEMENT OF THE ISSUES

1.    Could reasonable jurists debate the denial of Davis's claim that his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated by the State suppressing Tina McDonald's involvement in a prior violent crime?

2.    Could reasonable jurists debate the denial of Davis's claim that false evidence rendered his capital sentencing retrial unconstitutional?

## STATEMENT OF THE CASE

### I.    Procedural History

Davis was convicted and sentenced to death for capital murder in 1992. ROA.2554, 2606, 2617–18, 2620–21. The Texas Court of Criminal Appeals (CCA) affirmed Davis's conviction and sentence. ROA.7286–325. Davis did not seek certiorari review. Davis filed an application for a state writ of habeas corpus raising three claims. ROA.15298–333. The trial court entered findings of fact and conclusions of law recommending the denial of relief. ROA.15382–86. The CCA held that the trial court's findings and conclusions were supported by the record and denied habeas relief. ROA.15391–92.

Davis then filed a federal petition for a writ of habeas corpus in the Southern District of Texas. ROA.1127–79. On the same day, Davis filed a second state habeas application, raising the same issues as his federal petition. ROA.15398–449. The CCA held that Davis's subsequent state habeas application did not satisfy the requirements of Article 11.071, § 5

of the Texas Code of Criminal Procedure and dismissed it as an abuse of the writ. ROA.15520–21. In the federal habeas action, United States District Judge John D. Rainey[1] entered an order and final judgment rejecting the claims as procedurally defaulted, denying habeas relief, dismissing the case with prejudice, and declining to issue a COA. ROA.1180–98. Davis did not appeal.

Davis was scheduled to be executed on May 7, 2002. ROA.15661. Davis filed a third state habeas application and a motion to withdraw his then-pending execution date. ROA.15527–639. The CCA dismissed the application as an abuse of the writ under Article 11.071, § 5 and denied his request for a stay of execution. ROA.15522, 15661–62. This Court denied Davis's request for a stay of execution and authorization to file a successive federal habeas petition. ROA.1199–1201. The Supreme Court denied his application for a stay of execution and original petition for a writ of habeas corpus. *In re Davis*, 535 U.S. 1050 (2002).

On the day of his scheduled execution, Davis filed a fourth state habeas application and a motion for a stay of execution. ROA.15664–743.

---

[1]     Judge Rainey is now Senior Judge for the United States District Court, Southern District of Texas, Victoria Division.

The CCA dismissed the application as an abuse of the writ and denied his request for a stay of execution. ROA.15663, 15746–47. The Supreme Court granted Davis a stay of execution, ROA.15752–53, 15757–63, but later denied certiorari review of his dismissed fourth state habeas application, ROA.15756.

Davis's execution was then scheduled for August 13, 2002. ROA.15765–66. On August 7, 2002, Davis filed a fifth state habeas application and a motion for a stay of execution. ROA.17132–308. The CCA granted Davis a stay of execution, remanded his *Atkins*[2] claim to the habeas trial court for consideration, and dismissed the remaining allegation as an abuse of the writ. ROA.19169–70, 17131. After a six-day evidentiary hearing,[3] the habeas trial court entered findings of fact and conclusions of law and recommended the claim be rejected because Davis failed to prove by a preponderance of the evidence that he was intellectually disabled. ROA.17084–126. The CCA adopted the findings and conclusions and denied relief. ROA.19171–72.

---

[2]     *Atkins v. Virginia*, 536 U.S. 304 (2002).

[3]     The record consists of a six-volume state habeas clerk's record and an eleven-volume reporter's record of testimony and exhibits. ROA.15767–19168.

While his *Atkins* writ was pending, Davis filed a sixth state habeas application on May 6, 2005. ROA.19204–237. The CCA determined that Davis's claim challenging the jury's "nullification" instruction met the requirements of Article 11.071, § 5, and remanded his case to the habeas trial court. ROA.19745–46. Because of changes in Texas law, the CCA later dismissed the application. ROA.19749–51. However, the CCA decided to reconsider a nullification claim from Davis's -03 writ application. *Id*. The CCA granted relief in a separate opinion and remanded for a new punishment trial. *Ex parte Davis*, No. AP-76,263, 2009 WL 3839065, at *2 (Tex. Crim. App. Nov. 18, 2009).

After twelve days of punishment-phase evidence and argument, the jury answered the special issues on deliberateness, future dangerousness, and mitigation in such a manner that Davis was again sentenced to death on March 9, 2011. ROA.14301–02, 14305–06. The CCA affirmed Davis's sentence on direct appeal. ROA.15237–50. Davis did not seek certiorari review.

During the pendency of the direct appeal, the CCA declined Davis's request to reconsider on its own initiative the denial of his *Atkins* claim raised in his fifth state habeas application. ROA.19173–76.

Davis filed a seventh state habeas application on November 6, 2012. ROA.19809–998. The habeas trial court entered findings of fact and conclusions of law recommending that relief be denied. ROA.21036–99. Before the CCA ruled on the writ, Davis filed an eighth state habeas application on May 7, 2015. ROA.21319–423. In a combined order, the CCA denied Davis's seventh writ application based on the habeas trial court's findings of fact and conclusions of law and the CCA's own review and dismissed Davis's eighth application as an abuse of the writ. ROA.19801, 21490–93. Davis petitioned for a writ of certiorari to appeal the dismissal of his eighth state habeas application, and the Supreme Court denied review. *Davis v. Texas*, 580 U.S. 1057 (2017).

After the Southern District of Texas, Houston Division, appointed federal habeas counsel, ROA.20–22, Davis filed a ninth state habeas application, ROA.21507–733. The CCA remanded only Davis's *Atkins* claim to the habeas trial court for further proceedings to determine if the claim was procedurally defaulted and dismissed his four remaining claims for failing to meet an exception to Article 11.071, § 5. ROA.21741–44. The district court stayed the federal habeas action while Davis engaged in state court litigation. ROA.342–43. The habeas trial

court adopted findings of fact and conclusions of law recommending that Davis's *Atkins* claim be dismissed as an abuse of the writ. ROA.27193–209. However, the CCA declined to adopt the findings and conclusions, and instead determined that, based on its own review, Davis did not make an adequate prima facie showing on his *Atkins* claim and dismissed the application as an abuse of the writ. ROA.21735–40.

Davis filed an initial federal habeas petition, ROA.344–727, but failed to file an amended petition by the date allotted, ROA.742–46. Instead, Davis moved for a second stay and to hold the proceedings in abeyance while he exhausted state court remedies. ROA.747–57. The district court denied his motion, ROA.789–92, and the petition, ROA.2403–2531, 2532. Davis then filed a motion for a COA. The Director submits this opposition.

## II. Statement of Facts

### A. The State's Case for Guilt[4]

On August 10, 1991, Michael Alan Foster went to the Pik 'N Pak bar in Houston to hear a band perform. Foster, who was intellectually disabled, lived by himself. That same night, the owner of Pik 'N Pak saw Davis and his wife, Tina

---

[4] The district court noted that "[t]he record contains material from both Davis's initial trial proceedings in 1992 and the retrial of his [punishment] in 2011." ROA.2404 n.1.

Louise McDonald, arguing inside the bar. Davis was dressed in a way that revealed the large swastika tattoo on his chest.

. . .

Eventually, the owner saw Foster get into a car and leave with the couple. The owner was surprised; he knew Foster did not associate with people like Davis and McDonald.

On Tuesday, August 13, 1991, one of Foster's friends who had not seen him in a few days went inside his apartment. Foster's usually tidy apartment was in disarray. The friend called the police after finding Foster laying on the ground, covered in blood, with a pillow on his head. Foster was partially undressed. Someone had written white supremacist symbols on his body and on the apartment walls.

An autopsy revealed that Foster had been dead for at least several hours when he was found. Foster had suffered numerous stab wounds, including to his neck, abdomen, chest, and back.

. . .

The police investigation led to the club Foster had visited. The owner of the Pik 'N Pak club provided the police with a description of the people Foster left with on August 10. With that description, the police sought information from members of the skinhead community, which ultimately led them to McDonald.

By that point, both Davis and McDonald were already in police custody for an unrelated crime. The bar owner later identified Davis and McDonald as the couple with whom Foster left. The police recovered items in McDonald's car which had been taken from Foster's apartment such as his jacket and knife.

. . .

On November 21, 1991, Davis asked to speak with police officers. Davis told a police detective that "he was willing to confess to this crime in exchange for immunity for Tina McDonald." Davis also wanted a transfer to a different part of the jail facility. The police detective told Davis that he could not promise anything, but that he would convey Davis's request to an assistant district attorney. Davis then went before a state judge who informed Davis of his rights. Davis waived his rights in court.

. . .

The assistant district attorney told Davis that "the State was not making any deals or agreements with him, that Tina McDonald would be prosecuted if the evidence supported it, and that [Davis] did not have to make a statement." A police detective then again advised Davis of his rights, and he again waived them.

Davis gave an hour-and-twenty-minute-long videotaped statement confessing to the murder. Davis explained that he and McDonald met Foster for the first time at a bar on the night of the murder. They gave Foster a ride home in return for gas money. Davis had been drinking heavily. As they drove, Davis grew angry "by the way [Foster] was acting toward" McDonald. Davis said: "I wasn't for sure what I was going to do[,] you know. I didn't have it really planned to[,] you know[,] to kill the guy . . . [but] I knew I was going to whoop him up once we got to his house. . . ."

Foster invited the couple into his apartment. Once inside, Foster said he did not have any money. Davis began hitting him. In his confession, Davis described in detail how he assaulted Foster. So that he would not leave fingerprints, Davis put socks on his hands and then began stabbing Foster with a knife he found on the dresser. Davis got out his own

knife and repeatedly stabbed Foster until blood began spurting out of his body.

After Foster had died, Davis unsuccessfully searched his body for money. Davis told McDonald to write on the walls to throw off investigators. Davis admitted that he stole various items from the apartment, including ones later recovered by the police.

Davis, however, had difficulty remembering some details about the murder. Davis was unclear on at which bar he met Foster and on which night it had happened. Davis specifically said he "didn't know the date this took place" but "[i]t was either Friday or Saturday." Davis, however, also provided many verifiably correct details about the crime.

Davis's confession led to his arrest for capital murder for intentionally killing Foster on or about August 10, 1991, during a robbery.

ROA.2404–09 (footnotes omitted).

## B.   Davis's 1992 Trial

The State's case against Davis focused on his confession to Foster's murder. The defense challenged Davis's confession in a two-day pre-trial suppression hearing where nine witnesses testified. . . . The trial court denied the motion to suppress. The trial court subsequently entered factual findings and concluded that Davis gave his in-custody statement voluntarily.

At trial, Davis renewed his objections to the confession. The trial court overruled his objection and admitted Davis's videotaped confession into evidence. Still, the defense attempted to call Davis's confession into question before the jury on several grounds.

The jury convicted Davis of capital murder on June 11, 1992. A separate penalty hearing resulted in a death sentence.

ROA.2409–10 (footnotes omitted).

## C. Davis's 2011 Punishment Retrial

So that the jury could consider all relevant evidence in making its sentencing decision, the State adduced testimony about the Foster murder, including Davis's confession to the crime. Additionally, the State presented Davis's long history of criminal offenses. Davis had committed numerous crimes as a juvenile, including burglary and theft. During his time in the Texas Youth Commission, a psychologist labeled Davis with learning disabilities and emotional disturbances, but also identified him as a leader. Davis was repeatedly suspended and ultimately expelled from junior high school.

As an adult, Davis was convicted for delivery of marijuana. He had his resulting probation revoked. After serving a prison term, he absconded from a parole correctional program, which resulted in another prison sentence. Davis became a member of the Aryan Brotherhood of Texas and demonstrated his membership through various Nazi tattoos. Davis committed numerous prison violations such as possessing weapons, threatening officers, having drugs, assaulting officers by throwing bodily waste at them, using racial slurs, and possessing a cell phone.

After he was released from prison, Davis committed numerous unadjudicated bad acts, such as throwing a man off a second story building. Davis assaulted former girlfriends. Davis assaulted and shot at other people without provocation. Davis once choked his own mother. Davis committed violent robberies. Davis beat his wife, Tina McDonald.

Two of Davis's violent acts were particularly striking. First, McDonald and Davis committed a violent assault on a man named Steven Sherman only days after the Foster murder. In the assault, McDonald used a knife similar to one taken from Foster's apartment. The couple tied up Sherman and then stabbed him in the throat, stomach, and back. Second, the State presented evidence that Davis had committed another murder. In 1988, Davis killed Keith Blaylock during a robbery in Mineral Wells, Texas.

The State also called an expert, forensic psychologist Dr. Timothy Proctor[.]

. . .

The defense at the retrial attempted both to call into question Davis's commission of the Foster murder and to provide evidence mitigating against a death sentence. . . . The defense also called numerous witnesses to refute Davis's involvement in the extraneous Blaylock murder.

The defense called nine witnesses to give testimony about Davis's background and life history.

. . .

The defense also called expert witnesses to testify about Davis's mental health.

. . .

The jury answered Texas's special-issue questions in a manner requiring the imposition of a death sentence. The trial court sentenced Davis to death on March 9, 2011.

ROA.2418–21 (footnotes omitted).

## SUMMARY OF THE ARGUMENT

The district court entered a well-reasoned opinion and properly concluded Davis's claims were meritless even under de novo review. As a preliminary matter, Davis's claims challenging his 1992 conviction are successive and untimely. Further, the district court's rejection of Davis's claims is not debatable. First, the district court properly held Davis's *Brady* claim fails because Davis did not show that the allegedly suppressed police report was material. Second, the district court properly held Davis was not denied his right to due process based on the presentation of false evidence because Davis did not show that the complained-of testimony was false or material. Accordingly, a COA should be denied.

## STANDARD OF REVIEW

A COA can only issue if a petitioner shows reasonable jurists could debate whether the court below should have resolved his claims in a different manner or that this Court should encourage him to further litigate his claims. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). This standard applies to both merits and procedural rulings. *Buck v. Davis*, 580 U.S. 100, 122 (2017). If the ruling was procedural, the petitioner

must show both that the procedural ruling is debatable and that it is debatable he stated a valid claim. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court reviews findings of fact for clear error and conclusions of law de novo. *Gonzales v. Davis*, 924 F.3d 236, 242 (5th Cir. 2019). A district court's factual findings will not be disturbed unless they are implausible considering the whole record. *Id*. As to claims adjudicated on the merits by the state court, the COA determination is made with the deferential AEDPA[5] scheme in mind. *Barrientes v. Johnson,* 221 F.3d 741, 772 (5th Cir. 2000); *see Harrington v. Richter*, 562 U.S. 86, 100 (2011).

## ARGUMENT

### I.    Davis's Claims Challenging His 1992 Conviction Are Successive.

The district court held that Davis's 1992 conviction claims, including the *Brady* claim on which he seeks a COA, were not impermissibly successive or untimely due to his 2011 resentencing. ROA.1805–18, 2430–31. However, because Davis's claims challenging his

---

[5]    Anti-Terrorism and Effective Death Penalty Act of 1996.

1992 conviction could have been raised in his first federal petition, the district court did not have jurisdiction to consider those claims.

Davis was convicted and sentenced to death in 1992. ROA.21741. In 2009, he was "granted relief as to *punishment only*." ROA.21742 (emphasis added). After a punishment retrial, he was again sentenced to death. *Id.*

Davis raised claims in his second federal habeas petition that he could have presented in his first petition because they challenge his 1992 conviction for capital murder. Specifically, in a section entitled "1992 Guilt-Innocence Trial Direct Appeal Claims," Davis's second petition raised several claims involving his 1992 conviction. ROA.397–435, 522–27. But Davis challenged the constitutionality of his 1992 capital murder conviction in his federal habeas petition filed on March 9, 2000. ROA.1127–79; *see* ROA.2430 ("Davis had a full opportunity to litigate any claims relating to his 1992 trial in his first federal action."). However, he did not raise the claims challenging that conviction that he raised in his second petition. Accordingly, Davis needed to first obtain permission from this Court to again challenge the undisturbed 1992 conviction. 28 U.S.C. § 2244(b)(3).

Under 28 U.S.C. § 2244(b)(2)(A)–(B), if a prisoner asserts a claim that was not presented in a previous petition, the claim must be dismissed unless it falls within one of two narrow exceptions: the claims are predicated on newly discovered facts that could not have been discovered previously and that show by clear and convincing evidence no reasonable juror would have found him guilty or the claims rely on a new, retroactive rule of constitutional law. *In re Cathey*, 857 F.3d 221, 226 (5th Cir. 2017). Further, a petition containing new allegations is successive if it runs afoul of abuse-of-the-writ principles. *Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("The new restrictions on successive petitions constitute a modified res judicata rule, a restraint on what is called in habeas corpus practice 'abuse of the writ.'"). A claim constitutes an abuse of the writ if it challenges a petitioner's conviction or sentence that was or could have been raised in an earlier petition. *Adams v. Thaler*, 679 F.3d 312, 322 (5th Cir. 2012).

Without question, Davis could have presented these claims in his first petition. Pursuant to § 2244(b)(3)(A), "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order

authorizing the district court to consider the application." Davis will likely argue he could not have raised his *Brady* claim in his first petition, but that was a question for this court to decide in the first instance, not the district court. *See Blackman v. Davis*, 909 F.3d 772, 778–79 (5th Cir. 2018), as revised (Dec. 26, 2018) (*Brady* and false-testimony claims must be evaluated under § 2244(b)(2)(B)); *see also,* Order 4, *In re Reed*, No. 24-50529 (5th Cir. Nov. 5, 2024) (denying authorization of *Brady* claim because it did not satisfy § 2244(b)(2)(B)(ii)). Thus, the district court should have dismissed Davis's claims challenging his 1992 conviction, as it lacked jurisdiction to consider them because this Court has not granted Davis authorization to file a successive petition. *See* 28 U.S.C. § 2244(b)(3); *Burton v. Stewart*, 549 U.S. 147, 153 (2007).[6]

The district court correctly determined that *Magwood v. Patterson*, 561 U.S. 320 (2010), left unanswered the pertinent question of "whether 'a sentence and conviction form a single 'judgment' for purposes of habeas review.'" ROA.1810. It then held that *In re Greenwood*, No. 19-60884,

---

[6] "The applicant bears the burden of demonstrating that the petition does in fact comply with the statute, and the district court shall dismiss the petition unless that showing is made." *Moore v. Dretke*, 369 F.3d 844, 845 n.1 (5th Cir. 2004) (per curiam) (citing 28 U.S.C. § 2244(b)(4), and *Brown v. Lensing*, 171 F.3d 1031, 1032 (5th Cir. 1999)).

2022 WL 501393 (5th Cir. Feb. 18, 2022), an unpublished opinion with a vocal dissent, applied to Davis's case such that "Davis's second-in-time federal petition may include challenges to his conviction." ROA.1814–17. But *Greenwood* is distinguishable.

*Greenwood*, as an unpublished opinion, may be instructive, but it does not carry precedential value. 5th Cir. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case"). *Greenwood* involved the resentencing of a minor offender—sixteen years old at the time of the crime and sentenced to a mandatory life sentence without the possibility of parole—to a life sentence with the possibility of parole in light of *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016). *Greenwood*, 2022 WL 501393, at *1.[7] After the *Miller* and *Montgomery* decisions, Greenwood sought relief in state court and, with the State's agreement, the state court entered an order vacating the original sentence and resentenced Greenwood to life with the possibility of parole. *Id.* Greenwood then filed another federal

---

[7]     *See* Br. of Respondent 5, *In re Greenwood*, No. 19-60884, 2020 WL 4480768 (5th Cir. July 24, 2020).

habeas petition challenging this 2019 sentence. *Id*. The Court described Greenwood's second federal petition as "challeng[ing] the life-with-parole sentence imposed by the 2019 state court order." *Id*.

The issue for the Court was whether this new order created a new judgment that would allow Greenwood to challenge the 2019 judgment. *Id*. The majority of the panel, distinguishing *Greenwood* from prior caselaw that limited *Magwood's* application,[8] determined that because of the specifics of the particular order, the new order amounted to a new judgment because it explicitly vacated Greenwood's prior sentence and did not leave any count undisturbed but imposed an entirely new sentence for the sole charge of conviction. *Greenwood*, 2022 WL 501393, at *1. Relying on these distinctions, the Court determined the petition involved a new judgment under *Magwood* and was thus not successive. *Id*. at *2.

---

[8]      The majority cited: *United States v. Jones*, 796 F.3d 483, 485–86 (5th Cir. 2015) (holding that a sentence modification pursuant to 18 U.S.C. § 3582(c)(2) did not constitute a new sentence under *Magwood*); *In re Hensley*, 836 F.3d 504, 506–07 (5th Cir. 2016) (per curiam) (holding that a reinstated prior sentence did not constitute a new sentence and was therefore not a new judgment under *Magwood*); *In re Lampton*, 667 F.3d 585, 589 (5th Cir. 2012) (finding no new judgment where an order vacated the sentence and conviction of only one count in a multi-count conviction, leaving the sentences of the remaining counts undisturbed).

Importantly, *Greenwood* involved one trial with a *mandatory* sentence, *id.* at *4 (Duncan, J., dissenting), and differs from Davis's circumstance where he benefitted from a completely new 2011 resentencing. While the Director does not dispute that Davis may challenge the 2011 proceeding, it is controverted that he may resurrect claims pertaining solely to the 1992 conviction. Here, the 1992 conviction was separate and not altered by the 2011 sentencing; *Greenwood* did not touch on this issue.

Though the district court held that "[a]fter *Greenwood*, Davis's 'conviction and sentence' are a 'single unit[,]'" ROA.1817 (citing *Greenwood*, 2022 WL 501393, at *3), such a leap is unpersuasive, particularly since the majority did not indicate that it intended to resolve the question left open by *Magwood*.[9] *Greenwood*, 2022 WL 501393, at *3. Specifically, in prior caselaw, this Court noted that "*Magwood* left open the question of whether a petitioner who obtains a grant of habeas relief as to his sentence is able to challenge his underlying convictions in a subsequent § 2255 motion." *Parker*, 575 F. App'x at 418 n.3. That the

---

[9] Though the majority noted a circuit split, it did so without explanation, nor citation to any caselaw, including *In re Parker*, 575 F. App'x 415 (5th Cir. July 16, 2014), as discussed below. *Greenwood*, 2022 WL 501393, at *3 n.2.

majority did not intend to resolve this issue is evidenced by its failure to acknowledge *Parker*.[10]

Instead, the majority turned to *Scott v. Hubert*, 635 F.3d 659 (5th Cir. 2011)—a case that pre-dated *Parker* and involved the determination of finality for AEDPA statute of limitations purposes—applied its reasoning to successiveness, and concluded that, as in the context of finality, the term "judgment" includes the conviction and sentence as a "single unit." *Greenwood*, 2022 WL 501393, at *3. Notably, the majority in *Greenwood* used the same definition of "judgment" for both limitations and successiveness purposes but did not recognize that § 2244(b) does not refer to a "judgment" as does § 2244(d). Section 2244(b) refers to "claims."

Further, the Court, as part of its reasoning that the petition was not successive, recognized that *Scott* relied on *Burton v. Stewart*, 549 U.S. 147, 156–57 (2007), in determining that for AEDPA limitations purposes, final judgment means sentence.[11] *Scott*, 635 F.3d at 666. However, if

---

[10]    The *Greenwood* dissent discussed the majority's problematic reliance on *Magwood*, including its determination that the conviction and sentence is one unit. *See Greenwood*, 2022 WL 501393, at *6. Additionally, the dissent noted the developing circuit split. *Id*. at n.8.

[11]    *See* Brian R. Means, Federal Habeas Manual § 9A:18 (May 2022 Update) (discussing that the language relied on from *Burton* to determine finality was

*Burton*, which was discussed in *Magwood*, resolved the matter presented here, then surely the Supreme Court would have said as much in response to the State's concern—that the Court's reading of the statute could result in a petitioner challenging the underlying, undisturbed conviction in a subsequent application because a conviction and sentence form a single "judgment" for habeas purposes—instead of leaving the question unaddressed and citing to other appellate cases that limited review to the new portion of the judgment. *See Magwood*, 561 U.S. at 338–39, 342 n.16. In short, *Greenwood* did not resolve the issue left open by *Magwood* or the "developing circuit split." More importantly, *Greenwood* is a non-binding opinion based on a distinguishable fact

_____

dictum). Specifically, Burton filed his initial federal petition after the judgment in his case had been entered but while state review of his sentence was still pending. *Burton*, 549 U.S. at 151, 156. His federal petition was denied, and some three years later, after the state court resolved his sentencing challenges, Burton filed another federal petition. *Id*. The Supreme Court determined that this later filing was a second petition, and the district court was without jurisdiction to consider it. *Id*. at 152, 157. In response to Burton's argument that he had to file the initial petition prior to the state court's resolution of his challenges to the sentence or risk losing the chance to do so because of AEDPA's statute of limitations bar, the Court disagreed and remarked that the time calculations begin at the time judgment becomes final—which includes both the conviction and sentence. *Id*. at 156–57. Of note, that Burton's judgment had not become final for statute of limitations purposes until after the resolution of his initial federal petition did not provide another opportunity for him to challenge his claims. *Id*.

pattern—the resentencing of a minor offender who had received a mandatory life sentence and who later received a new, more lenient sentence.[12] *See Greenwood*, 2022 WL 501393, at *6 (Duncan, J., dissenting).

Interestingly, the Seventh Circuit does not apply *Magwood* when a new post-resentencing petition challenges the underlying conviction. *Suggs v. United States*, 705 F.3d 279, 280–81 (7th Cir. 2013). In *Suggs*, the court stated that *Magwood* "took pains to limit its holding" and did not address whether a petition following resentencing is "second or successive" if the challenge is to the underlying conviction and not the resentencing. *Id*. at 284. Seventh Circuit precedent mandated that a petition filed after resentencing was successive if it alleged errors made before the new sentence. *Id*. at 283. Therefore, the court stated, "[b]ecause the question before us is settled in our circuit and the Supreme Court considered the question but expressly declined to answer it, we

---

[12]    Similarly, the majority in *Greenwood* relied on *Burton*, *Hubert*, and *Lampton* to find the petition in that case was not successive. 2022 WL 501393, at *2–3. But each of those opinions pre-dated *Parker* in which this Court explicitly stated *Magwood* had not answered the question of whether a challenge to an undisturbed conviction is impermissibly successive and declined to answer the question. *In re Parker*, 575 F. App'x at 418 n.3.

follow our circuit's precedents and hold that Suggs'[s] motion is second or successive." *Id*. at 284.

The Seventh Circuit noted that the Ninth and Second Circuits had reached different conclusions on this issue. *Id*. at 284–85 (citing *Wentzell v. Neven*, 674 F.3d 1124 (9th Cir. 2012), and *Johnson v. United States*, 623 F.3d 41 (2d Cir. 2010)). The Seventh Circuit addressed the extent to which its sister circuit court's holdings undercut § 2244(b)'s strict provisions. *Id*. at 285 (describing the effect of relaxing limits on successive claims as "an unlikely result").

That Davis's claims in his federal petition were not raised in his first petition is not a meaningful difference. Claims that were "presented in a prior" petition *and* claims that were not presented in a prior petition "shall be dismissed," unless a previously unraised claim meets the strict standards of the statute. § 2244(b)(1)–(2). This underscores the necessary limitations on *Greenwood*. If *Greenwood* permits the filing of a successive federal petition that raises challenges to an undisturbed conviction alongside challenges to a new sentence, it would allow the filing of claims that were previously denied on the merits. Such a result could not have been intended by the *Greenwood* majority; indeed, such a result is not

permissible. *See Greenwood*, 2022 WL 501393, at *6 (Duncan, J., dissenting); *cf. Shinn v. Martinez Ramirez*, 596 U.S. 366, 385 (2022) (stating that courts "have no authority to amend" a statute). This Court has consistently held that a petition is second or successive when it: "1) raises a claim challenging the petitioner's conviction or sentence that was or *could have been* raised in an earlier petition; or 2) otherwise constitutes an abuse of the writ." *Hardemon v. Quarterman*, 516 F.3d 272, 275 (5th Cir. 2008) (emphasis added) (quoting *In re Cain*, 137 F.3d 234, 235 (5th Cir. 1998)); *see Adams*, 679 F.3d at 322.

A petitioner should not be allowed to litigate challenges to a conviction that could have been presented during federal habeas review simply because he was granted a new punishment hearing. *Gonzales v. Davis*, No. 7:12-CV-126 (W.D. Tex. Apr. 13, 2018), ECF No. 163 (stating that a "petitioner should not be allowed to resurrect challenges to a conviction previously rejected on federal habeas review simply because he has been granted a new punishment hearing"). That is, Davis is permitted to collaterally attack only his second punishment trial and any potential errors that arose from that proceeding. But with respect to his first trial and undisturbed conviction, Davis has had his day in court, and

he should have been required to seek this Court's authorization to have another. *Magwood* and *Greenwood* cannot be read to sanction litigation of claims that could have been previously raised or have already been rejected in federal court. Thus, the district court did not have jurisdiction to consider Davis's 1992 trial claims.

## II. The District Court's Rejection of Davis's *Brady* Claim Is Not Debatable.

Davis asks for a COA on his *Brady* claim alleging that the State suppressed Tina McDonald's involvement in a prior violent crime involving white supremacists. Mot.14–51. But no reasonable jurist would debate the district court's rejection of Davis's untimely, procedurally defaulted, and meritless claim. Therefore, this Court should deny a COA.

### A. Davis's *Brady* claim is untimely.

The district court conducted a de novo review of Davis's *Brady* claim and denied it under either the cause-and-prejudice test or on the merits. ROA.2478. But importantly, this claim is also untimely, and a COA should be denied on that basis.[13] *See Ricks v. Lumpkin*, 120 F.4th 1287,

---

[13] As discussed in the Director's amended answer, ROA.1947–53, all of Davis's claims challenging his 1992 conviction are time-barred. Because the only claim Davis raises in his application for a COA that relates to his 1992

1291 (5th Cir. 2024) (denying a COA as to a procedurally defaulted claim even where the district court did not address the default because the claim was "destined to fail" on that basis).

Under AEDPA, a state prisoner has one year to file a federal habeas petition, starting, in this case, from the latest of either "(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;" or "(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(B), (D). Assuming arguendo that the operative date is March 9, 2011[14] for both events, the limitations period under § 2244(d) for filing Davis's federal petition expired a year later on March 9, 2012.

---

conviction is his *Brady* claim, the Director will only address the untimeliness of that claim in this response.

[14]     Davis contends that the Pasadena Police Department Records were turned over to the defense "prior to the 2011 punishment retrial." ROA.480. He does not give a date for the disclosure. However, he was resentenced to death on March 9, 2011, so the records were provided before that date. ROA.14301–02. To the extent Davis argues the operative date is when his 2011 resentencing became final, such an argument should be rejected. *See* ROA.1947–53.

Davis is not entitled to statutory tolling under § 2244(d)(2). Davis filed his -07 state writ application on November 6, 2012, ROA.19809, eight months after the limitations period expired. Regardless, that application did not include the current *Brady* claim. The claim was first raised in Davis's -09 state writ application, which was filed on May 16, 2017, ROA.21507, more than five years after the limitations period ended on March 9, 2012. Equitable tolling is not available to Davis because after becoming aware of the allegedly suppressed information before retrial on punishment, he failed to diligently pursue his right to bring the *Brady* claim at an earlier date. *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (equitable tolling available only if a petitioner "has been pursuing his rights diligently" and "some extraordinary circumstance stood in his way and prevented timely filing.").

Finally, while a petitioner may overcome a time-bar based on actual innocence, *id.* at 386, Davis failed to present new reliable evidence sufficient to show that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Thus, his *Brady* claim is untimely, and a COA should be denied.

## B.     Factual background

Davis contends that the State did not disclose Tina McDonald's involvement in "prior violent crimes involving her skinhead group[.]" Mot.14. He points to a February 3, 1991, Pasadena Police Department (PPD) report concerning one criminal trespass and Class A assault six months prior to Foster's murder. Mot.15–24; ROA.24470–81.

PPD records indicate that McDonald and a large group went to an apartment looking for an individual named Springer who owed money; McDonald knocked on the door and was allowed inside by Springer's roommate; approximately fifteen people followed her and started attacking the roommate thinking he was Springer; McDonald yelled "That's not him" and the suspects stopped beating the victim. ROA.24470–81. The District Attorney's office did not file charges against McDonald because she was given permission to enter and neither the victim nor the victim's girlfriend (the witness) saw McDonald attack him. ROA.24479.

## C.     The district court's rejection of this claim is not debatable.

Davis asserts the district court's rejection of his *Brady* claim is debatable because the court faulted trial counsel's lack of diligence in

uncovering the information, was incorrect in determining that the evidence was not material, and disregarded trial counsel's view on the favorability and materiality of the suppressed evidence. Mot.14, 26–27, 49–50. Even under the district court's de novo review, reasonable jurists could not debate its rejection of Davis's claim on procedural or substantive grounds.

Due process requires the State to disclose material, exculpatory evidence to the defense. *Brady*, 373 U.S. at 87. The prosecutor's duty to disclose extends to both exculpatory and impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted). To prevail, Davis must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). For a procedurally defaulted *Brady* claim, "cause" parallels the "suppression" component, while "prejudice" parallels "materiality." *Banks*, 540 U.S. at 691.

This claim was largely presented in Davis's -09 state writ application and dismissed as an abuse of the writ. ROA.21571–86, 21743–44. Consequently, the claim is procedurally defaulted. For the reasons discussed below, Davis cannot excuse the procedural default of this claim by showing either cause and prejudice for the default or a miscarriage of justice.

Davis criticizes the district court for denying his claim "because defense counsel allegedly did not show diligence in investigating the suppressed facts." Mot.16. The district court "observe[d] that information about McDonald's earlier crime *may* have been available to Davis." ROA.2475 (emphasis added). It pointed out that the defense knew about McDonald's pending charges for auto theft, attempted murder, aggravated robbery, and credit card abuse and McDonald's ex-boyfriend, Bryan Falconer.[15] ROA.2476. Indeed, during the 1992 trial, McDonald's pending charges were put on the record during the pretrial motion on the voluntariness of Davis's confession, ROA.2947, and trial counsel questioned a witness about Falconer's prior relationship with McDonald,

---

[15] Falconer is referred to as "Brian Faulkner" throughout the 1992 Reporter's Record.

his hair color, which matched Davis's, and his many tattoos, ROA.6018–20. Trial counsel also elicited testimony that McDonald had "a lot" of close male friends and it was common to see people with swastika tattoos in McDonald's group of friends. ROA.6022–23. Thus, the district court correctly observed that McDonald's involvement in other violent crimes was known to 1992 trial counsel. ROA.2476–77. And Falconer's status as an alternative suspect was not only reasonably discoverable through due diligence but was actually put before the jury. *See Reed v. Stephens*, 650 F.3d 753, 781 (5th Cir. 2014) ("A petitioner's *Brady* claim fails if the suppressed evidence was discoverable through reasonable due diligence."). Additionally, there was evidence before the jury that McDonald ran with a crowd that sported swastika tattoos. ROA.6023–24.

However, the district court went on to conclude that "even assuming the information was both favorable to Davis and suppressed . . . it was not material." ROA.2477. Davis alleges that the PPD records would have provided an alternative suspect in Foster's murder. Mot.28. But the district court's conclusion that the police report was not material is not debatable.

The PPD records concern one criminal trespass/Class A assault about six months before Foster's murder. ROA.24470–81. While the offense report described a violent incident, it is not at all similar to the facts surrounding Foster's capital murder. *See* ROA.2477. The PPD records indicate that McDonald and a group of cohorts went to an apartment looking for an individual named Springer who owed money; McDonald was allowed inside by Springer's roommate; approximately fifteen people followed her and started attacking the roommate thinking he was Springer; McDonald yelled "That's not him" and the suspects stopped beating the victim. ROA.24470–81. No charges were filed against McDonald because she was given permission to enter and neither the victim nor the victim's girlfriend (the witness) saw McDonald attack him. ROA.24479. While Skinhead writings were found at the Foster crime scene, the evidence establishes that McDonald was present and that Davis ordered her to write on the walls to distract the police. *See* Statement of Facts, Part II.A, *supra*. Davis's assertion that the unrelated offense gives rise to Falconer as an alternative suspect because he was one of the fifteen people involved in the prior assault or explains the Skinhead writings is wishful thinking at best.

Davis also argues that the district court wholly disregarded the view of 1992 trial counsel on the "suppression, favorability, and materiality" of the evidence. Mot.49–50. But even if counsel could have developed a stronger theory that Falconer was an alternative suspect based on this evidence, there is no reasonable probability that, had this evidence been disclosed, the result of the proceeding would have been different. *See Bagley*, 473 U.S. at 684. The jury heard compelling testimony that Davis and McDonald were the last people seen with Foster while he was alive; Foster left the Pik 'n Pak with the couple in an older model Camaro being driven by Davis; Davis's videotaped confession recounted numerous details about the crime scene and his robbery and murder of Foster; Davis confessed to ordering McDonald to write on the walls to distract the police, which explains the swastikas and "NSSH"; various items stolen from Foster's apartment were recovered from the Camero; and Davis used the dagger stolen from Foster's apartment a week after the capital crime to commit an extraneous attempted capital murder. *See* Statement of Facts, Part II.A, *supra*.

Davis's argument to the contrary rests almost entirely on the estimate for Foster's time of death that was discussed at his 1992 trial,

which Davis argues is inconsistent with the timeline he gave in his confession. Mot.27–30. But he entirely ignores the testimony of Dr. Dwayne Wolf who testified in 2011 that the evidence of decomposition indicated Foster had been dead from one to three days prior to discovery. ROA.12752–53. That time of death is consistent with Davis's confession.

Davis has not satisfied the requirements of *Brady* or shown that reasonable jurists would debate the district court's rejection of this claim. A COA should be denied.

## III. The District Court's Rejection of Davis's False Testimony Claim Is Not Debatable.

Davis seeks a COA to appeal the district court's denial of his claim that his death sentence violates the Eighth Amendment because it is based on "materially inaccurate" evidence. Mot.51–66. No reasonable jurist would debate the district court's rejection of his procedurally barred and meritless false testimony claim.

### A. Factual background

During the 2011 punishment retrial, the State introduced evidence linking Davis to the 1988 cold-case murder of Keith Blaylock in Mineral Wells, Texas. ROA.2459–60. On June 16, 1988, Carlos Ortiz stopped at the Beverage Barn in Mineral Wells to visit his friend Blaylock, who was

working there during the summer after his first year at college. ROA.12809–14. Blaylock and Ortiz made plans to meet at a dance after the store closed, but Blaylock never arrived. ROA.12815–16.

The next morning, Larry and Judy Fulbright, owners of the Beverage Barn, discovered the store keys in the parking lot and the cash register open inside the business. ROA.12833, 12837–38. The night deposit had not been made, and the money bag used for the deposit was missing. ROA.12838–41, 12860. Blaylock and his red and white Chevrolet pickup were not at the Beverage Barn. ROA.12817–18, 12832–12834. Davis's aunt, Annetta Williams, also worked at the Beverage Barn during the summer of 1988, and allowed Davis to hang around. ROA.12830, 12856. The Fulbrights, who had concerns about Davis, told her they did not want him there. ROA.12846, 12855–57.

Blaylock's body was found on June 17, 1988, in a remote area at the end of Inspiration Point Road. ROA.12881–90. His body was face down with a gunshot wound to the back of his skull. ROA.12891–92. Texas Ranger Bill Peterson found a flattened .22 caliber bullet nearby, ROA.12907–09, but the bullet was too damaged to determine class characteristics. ROA.13001–05.

The following day, Blaylock's abandoned truck was found five or six miles from the Beverage Barn on Union Road. ROA.12902. Blaylock's billfold was on the dashboard of the truck and what appeared to be a pantyhose stocking mask was in the center of the bench seat. ROA.12905–06. The stocking mask and fingerprints recovered from the truck were sent to the Institute of Forensic Sciences in Dallas; however, DNA testing was not being done at the time, there was no hit on the fingerprints, and no trace evidence of any value was recovered. ROA.12931–33, 12964–69.

In July 1988, Davis was asked to come to the police station after a car was stopped in which he was a passenger. ROA.12934–35. Davis admitted having a conversation at the Dog House Tavern where he discussed robbing the Beverage Barn, but claimed he was not serious. ROA.12935–36. The police had no reason to arrest him then and he was released. ROA.12936. Many leads were followed but the case remained unsolved. ROA.12911–15.

In 2003, the Mineral Wells Police Department received a tip which resulted in their contacting Thomas Cason, who was initially uncooperative. ROA.13020–27. After negotiations, Cason received full

immunity and gave information about Blaylock's murder, including non-public knowledge about a stocking mask found in the truck. ROA.13028–43. The police believed Cason was involved in the capital murder and that Davis was a suspect, but additional evidence was needed to file charges. ROA.13041, 13044, 13048.

Initially, the case file containing the stocking mask could not be located, so DNA testing could not be conducted. ROA.13038–44. However, in 2010, the case file was located among hundreds of randomly filed case boxes that only had date ranges, not victim names, on the outside of the boxes. ROA.13048–51, 13102–08. The stocking, still in the sealed evidence bag, was submitted to the DPS Crime Lab for DNA testing. ROA.13051–56.

Cason testified that he was living with his grandmother in Mineral Wells in the summer of 1988; he met Davis while selling drugs and doing drugs at a friend's house; Davis was living with his mother Joyce who worked at the Dog House Tavern; Davis's aunt Annetta worked at the Beverage Barn; and Davis did not have a job or a car. ROA.13210–17. According to Cason, Davis mentioned robbing the Beverage Barn a couple of times, knew when the bank deposits were made, and knew when the

business would have the most money, but Cason did not think Davis was serious. ROA.13220.

Cason testified that around 5:00 p.m. on the day of Blaylock's murder, Davis walked to Cason's house and wanted Cason's .22 caliber gun to use to rob the Beverage Barn. ROA.13221. Cason gave Davis his loaded .22 and they discussed the particulars of the robbery. ROA.13222. Davis used Cason's bike to ride to the Dog House Tavern where he got his mother's car and returned to Cason's house with the bike in the trunk. ROA.13222–23. Cason got a pair of his grandmother's pantyhose, cut one of the legs off, and gave it to Davis to use to cover his face. ROA.13224–25.

Using Davis's mother's car, Cason dropped Davis off near the Beverage Barn and drove home. ROA.13225–27. Davis called Cason two or two-and-a-half hours later to pick him up at a convenience store. ROA.13228. Davis was parked in a red Chevrolet pickup and said he needed to get rid of it. ROA.13231–32. Davis followed Cason to the end of Union Road where Davis wiped down the steering wheel or rummaged through the truck and left the truck. ROA.13233–35.

Cason testified that after Davis got in the car, Davis said he took the truck from the "boy" after the boy recognized him. ROA.13236. When

they got back to Cason's house, Davis returned his mother's car and came back riding Cason's bike. ROA.13237. They cut open the locked money bag, burned the checks, and divided the cash. ROA.13237–38. Davis showed Cason a plastic Swatch watch and a gold nugget necklace with a couple of diamonds in it that he had taken from the boy. ROA.13238–39.[16] The next day, Davis gave the gun to a man who came to Cason's house to buy drugs. ROA.13241–43. At that point, Cason did not know how or where Davis killed Blaylock. ROA.13244.

Uyen Henson, a DPS Crime Lab forensic scientist, performed DNA analysis of the stocking mask and buccal swabs from Cason and Davis. ROA.13136, ROA.13142–50.[17] Henson determined there was at least one male profile and a female profile in the DNA mixture obtained from a swab of the stocking, results consistent with a female wearing the stocking before a male contributed to the mixture. ROA.13158–64, 13166. DNA analysis excluded Cason as a contributor to the mixture, but Davis could not be excluded. ROA.13162. The probability of selecting an

---

[16]    Blaylock's mother identified a photograph of her son wearing the jewelry, which was never recovered. ROA.12867–69.

[17]    Henson's DNA report was admitted into evidence. ROA.13146–47, 14797–800.

unrelated person at random who could be a contributor to the profile would be 1 in 7.299 million in the African-American population, 1 in 511,800 in the Hispanic population, and 1 in 758,200 in the Caucasian population. ROA.13164–65.

The defense presented evidence to refute Davis's involvement in Blaylock's capital murder. Kenneth Seigler purportedly identified Tyler Strader as a potential suspect. However, when called by the defense, Seigler testified that he was arrested by Mineral Wells police on January 28, 1990, he did not remember telling the police that he could not go to jail because Strader would kill him, and he did not recall saying that he should "roll over" on Strader regarding a murder. ROA.13384–87. After defense counsel provided Seigler a copy of the statement he gave to police on January 28, 1990, Seigler testified that he did not remember anything about a pickup until he read the statement, in which he said he saw a Chevrolet pickup parked on the side of Union Hill Road in the afternoon. ROA.13391–92. Seigler did not remember seeing Strader on June 17, 1988, but he might have. ROA.13392. After further reviewing his statement, Seigler testified that he made up the whole thing when he told police Strader committed the murder. ROA.13393–94. Seigler admitted

that he lied about seeing the pickup on Union Hill Road. ROA.13399–400. Jerry White, a retired police officer, testified that he took a statement from Seigler in January 1990, and he did not make a deal with Seigler to obtain the statement. ROA.13415–16, 13422.

Another Mineral Wells resident, Harold Hall, testified that he was in the Baker Hotel Lounge a day or so after learning about the Blaylock murder, and he overheard an intoxicated Strader describing a head moving up and down and feet kicking. ROA.13964–66. Hall thought that Strader was talking about killing an animal. ROA.13966. When someone asked Strader a question, he said he killed someone from a store. ROA.13936–38. Hall also testified that he heard Strader say that he killed someone at a store. ROA.13965.

Retired Texas Ranger Bill Peterson testified that he was aware of the Mineral Wells police interview with Seigler concerning information about Strader. ROA.13438–40. According to Peterson, there were other persons of interest in the Blaylock murder case and if the police were looking at Strader in March 1991, it was with very little interest. ROA.13440–43. Peterson testified that Davis's fingerprints did not match the prints found in Blaylock's truck. ROA.13445–46. On March 29, 1989,

Peterson spoke with Monesa Mendoza and took a statement from her but did not suggest times and dates to her. ROA.13432–36.

Monesa Mendoza Downs, Strader's girlfriend at the time of the murder, testified that she lived in Mineral Wells in 1988 and gave a sworn statement in March 1989. ROA.13515–17. The trial judge ruled that Downs could not testify about the content of her statement because it was based on hearsay. ROA.13517–20; *see also* ROA.13464–89 (proffer related to Downs' statement and trial judge's ruling).

Vzalue Genzel, who had lived on Inspiration Point Road in Mineral Wells since 1982, testified that she saw a pickup truck drive down the road during the day with three men in it, and the young man in the middle was struggling as if he was trying to get attention. ROA.13450–55. After the truck drove by, Genzel heard gunshots and then later saw the truck returning with only two people in it. ROA.13456. Genzel found out the next day that a body had been found on Inspiration Point Road. ROA.13457.

Henry Castle, a prison inmate who formerly lived on Inspiration Point Road in Mineral Wells, testified that he told the police about seeing a pickup truck drive slowly by his house with either two or three people

in the front seat. ROA.13900–05. Castle went to his cousin's house on Inspiration Point Road and heard gunshots. ROA.13905–06. Castle first testified that it was still daylight and then said he was not sure if it was day or night. ROA.13906–07. After looking at his statements, Castle testified that he first said it was night but then said it was daylight or he would not have known the color of the truck. ROA.13910. Castle initially said he saw a barrel of a gun and people struggling in the truck, but then said he did not see that. ROA.13911.

## B.    The relevant standards

Due process is violated when the prosecution *knowingly* presents false testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269–70 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). To establish such a claim, a petitioner must demonstrate "1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (quoting *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998)). The Supreme Court has never held that a due process violation occurs from the unknowing use of false testimony. *See Pierre v. Vannoy*,

891 F.3d 224, 228–29 (5th Cir. 2018). "[T]estimony is material if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Canales*, 765 F.3d at 573 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Giglio*, 405 U.S. at 154)).

Davis argues that his claim is not a *Giglio/Napue* false testimony claim, but a *Johnson v. Mississippi*, 486 U.S. 578 (1988) claim. Mot.57. In *Johnson*, the Supreme Court addressed whether Johnson's death sentence could stand despite being predicated on the existence of a prior assault conviction that was vacated after his trial. 486 U.S. at 585–86. During Johnson's sentencing, the jury found three aggravating factors, including that Johnson had been previously convicted of a violent felony, an assault. *Id.* at 581 n.1. The only evidence presented to prove the assault was a copy of Johnson's prison commitment. *Id.* at 581. No witnesses testified about the underlying facts of the assault. *Id.* at 585. After the trial, a court reversed the assault conviction. *Id.* at 582.

The Supreme Court held that Johnson's death sentence could not stand because it was predicated on an aggravating circumstance that was "materially inaccurate." *Id.* at 589. In so holding, the Court stated that, "petitioner's death sentence is now predicated, in part, on a New York

judgment that is not valid now, and was not valid when it was entered in 1963." *Id.* at 585 n.6. However, the Court indicated that it may have reached a different conclusion if additional evidence (e.g., witness testimony) had been admitted. *Id.* at 590 n.9.

## C. Davis's claim is procedurally defaulted.

The district court conducted a de novo review of Davis's false testimony claim and denied it on the merits. ROA.2466–70. But importantly, the claim is procedurally defaulted, and a COA should be denied on that basis.

Davis's false testimony claim was raised in his -09 state habeas application as Claim 2 and dismissed by the CCA as an abuse of the writ. ROA.21553–71, 21735–40. The district court pointed to Davis's argument in state court that this claim was previously unavailable under Texas Code of Criminal Procedure Article 11.071, § 5(a)(1). ROA.2465–66. But because the CCA stated that Davis had not made a "prima facie showing," which sometimes indicates that the CCA reached the merits of the claim, the district court found it unclear whether the CCA's dismissal was a procedural or merits-based decision. *Id.*

This Court has indicated that the federal courts should review the specific circumstances of the CCA's dismissal of a habeas application to determine whether the CCA's ruling is based on an independent and adequate state law ground precluding federal merits review or if the ruling is intertwined with federal law. *See*, *e.g.*, *Canales*, 765 F.3d at 564–67. Here, the CCA's order does not specify which provision of Article 11.071, § 5, the CCA relied upon; however, context clarifies that the ruling rested on the claim's previous availability.

Section 5 forbids Texas courts to consider a prisoner's subsequent state habeas application unless:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3)    by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

Tex. Code Crim. Proc. art. 11.071 § 5(a).

This Court has explained that § 5's last two provisions—(a)(2) and (a)(3)—are dependent on federal law and yield a merits determination subject to § 2254(d) review. *Canales*, 765 F.3d at 565. The first provision, (a)(1), has two parts, one based on availability, and another based on whether a potential constitutional violation has been established. *Id*. If the CCA ruled on availability, the procedural bar stands. *Id*. To determine that the CCA ruled on the merits more than silence is required; rather, there must be a fair indication of merits review. *Id*.

Here, the CCA ruled on availability, as reflected by its order. First, the CCA made no explicit evaluation of the merits of state habeas Claims 1–3 & 5. ROA.21742–44. While the CCA's order remanding Davis's intellectual-disability claim stated the court found Davis failed to show his other claims set forth a prima facie showing that they met § 5, *id*., the CCA ultimately dismissed them with no indication that it did so based

on the merits, ROA.21740 ("[W]e now hold that he has failed to satisfy the requirements for a subsequent writ under Article 11.071, § 5.").

Second, this claim group included an ineffectiveness claim, Claim 5, based on failure to interview witnesses prior to trial. ROA.21623–30. The ineffectiveness argument did not even attempt to argue that § 5(a)(1) was satisfied. *Id.* There is no plausible reason for the CCA to have rested its decision on Claim 5 on anything but availability and Claim 2 is grouped with Claim 5.

Third, the CCA specifically remanded Davis's intellectual disability claim for further proceeding because it relied on a previously unavailable basis. ROA.21743–44. It would be odd for the CCA to remand one unavailable claim but not another. *See Canales*, 765 F.3d at 566 (holding claims dismissed under § 5 were barred because the fact that the CCA dismissed them "instead of remanding them to state district court for a merits determination," showed they were dismissed pursuant to § 5(a)(1)).

Fourth, it is obvious that the instant claim was previously available to Davis. Davis would have known through his personal experience whether he was involved in the extraneous murder and therefore could

have possibly left DNA on the stocking. If the State's testing was incorrectly inculpating him of a crime that he did not commit, Davis would have known it from the start.[18]

And finally, in Davis's state habeas application, he specifically argued that the claim was previously unavailable. ROA.21564. There is no fair indication that the CCA reached the merits—indeed, all signs point to the contrary conclusion. *See Canales*, 765 F.3d at 566; *Rocha v. Thaler*, 626 F.3d 815, 837–39 (5th Cir. 2010); *but see In re Davila*, 888 F.3d 179, 188–89 (5th Cir. 2018). Therefore, this claim is procedurally defaulted because it was dismissed by the state court pursuant to an independent and adequate procedural bar.

Davis also argues that his claim is not a *Giglio/Napue* false testimony claim, but a *Johnson v. Mississippi* claim. Mot.57. The district court did not address whether Davis exhausted a *Johnson* claim in state court. *See* ROA.2459–70. But, importantly, to the extent Davis is now raising a *Johnson* claim, his claim is unexhausted and procedurally

---

[18] Orchid Cellmark's testing, done at the defense's request prior to retrial, also confirmed that Davis could not be excluded as contributor to the DNA on the stocking. ROA.21068 (-07 State Habeas Court Findings of Fact and Conclusions of Law #151); ROA.19945 (-07 state habeas application).

barred because he did not raise it in state court. Therefore, irrespective of the CCA's dismissal of Davis's *Giglio/Napue* claim, his *Johnson* claim is undebatably barred from merits consideration.

Under 28 U.S.C. § 2254(b)(1)(A), habeas relief "shall not be granted" unless it appears that "the applicant has exhausted the remedies available in the courts of the State." And "[t]he exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citing *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982)). While Davis cited *Johnson* in his -09 state habeas application, ROA.21569–71, he framed the claim as a standard false testimony claim. Such claims are evaluated under the familiar *Napue* standard. ROA.21565–66. Under *Napue*, a conviction must be set aside where the petitioner has demonstrated that: (1) a witness gave false testimony; (2) the falsity was material; and (3) the prosecution knew the testimony was false. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

This is precisely the rubric followed by Davis's state habeas application, which argued under successive headings:

1. "The State Presented False Evidence Regarding Whether DNA Evidence Connected Davis to the

51

Stocking Cap Left at the Crime Scene of Keith Blaylock's Murder." ROA.21566 (Heading H).

2. "The State is Imputed Knowledge of the Falsity of the Testimony." ROA.21567 (Heading I).

3. "The False Testimony Presented by the State Was Material." ROA.21568 (Heading J).

Davis's state habeas application cited *Napue* cases like *Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex. Crim. App. 1996), *Giglio*, 405 U.S. 150, and *Napue* itself. ROA.21559–62, 61565–66. Davis also cited *Napue*'s state law analogue (which lacks the federal "knowing" component), including *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) and *Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012). ROA.21562–63. In short, this claim was presented as a false testimony claim. Therefore, his federal habeas claim relying on *Johnson* is a new legal theory and unexhausted. Now, Davis's unexhausted *Johnson* claim is procedurally defaulted because if he filed a subsequent state habeas application in an attempt to exhaust the claim, that application would be dismissed as an abuse of the writ. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014). Davis does not attempt to show cause or prejudice for that default. A COA should therefore be denied on Davis's undebatably defaulted claim.

**D. The district court's rejection of this claim is not debatable.**

Davis claims that the district court mischaracterized DPS's retraction of the trial testimony and erred in deciding that prejudice was not shown. Mot.63–64. Even under the district court's de novo review, reasonable jurists could not debate its rejection of Davis's claim.

The district court held that Davis did not demonstrate that the testimony given in 2011 by DNA Forensic Analyst Uyen Henson was false. ROA.2468. During retrial on punishment, Henson testified regarding DNA testing concerning the cold-case capital murder of Keith Blaylock. In general, Henson testified that DNA testing in 2010 on the stocking mask recovered from Blaylock's abandoned truck determined that there was a mixture of DNA from at least one male and one female, that Thomas Cason was excluded as a contributor to the mixture, but Davis could not be excluded. ROA.13162–66.[19]

Importantly, Davis did not identify any statement made by Henson that was actually false or misleading at the time of trial. Davis instead contends that Henson's 2011 testimony is now false because the DPS

---

[19]    Henson's testimony is summarized more fully in the Factual Background, Part III.A, *supra*.

Crime Lab recanted the scientific basis of his testimony in 2017. Mot.54–57. The Supreme Court has never held that a *Giglio/Napue* violation can arise in this manner. *See*, *e.g.*, *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) (petitioner must prove that the prosecution knowingly presented or failed to correct materially false testimony *during trial*). Any extension of *Giglio* and *Napue* in the manner argued by Davis is barred by *Teague v. Lane*, 489 U.S. 288, 310 (1989).

Even if a false testimony claim could arise based on events occurring years after trial, it still would not benefit Davis. The DPS Crime Lab did not recant the testimony given during the punishment retrial. Davis's evidence shows that in 2015, the Texas Forensic Science Commission identified minor discrepancies in STR population databases and issued an advisory that if a lab is unable to confirm the use of currently accepted protocols for mixture interpretation, then counsel should consider requesting a recalculation. ROA.24055–58. Davis states that on September 29, 2015, his state habeas counsel requested a recalculation of the DNA results obtained on the stocking mask. Mot.55.

Melissa Haas, DPS DNA Section Supervisor III at the Texas DPS Garland Crime Laboratory, provided a letter dated April 28, 2017, that

gives the background and describes the events surrounding the attempted reinterpretation of data. ROA.24465–67. According to Haas, when the original data was analyzed at a lower analytical threshold, there was potential allele drop-in or possible contamination in the reagent blank during the analysis. ROA.24466. Because the reagent blank was depleted, the MiniFiler kit was no longer suitable for reinterpretation. *Id*. Additionally, when the threshold was lowered, the mixture represented at least five contributors, which was too complex for interpretation under DPS policy. *Id*. Haas stated that "no interpretation can be made to the swabbing from the stocking using current protocols due to the quality event. If we did not have the quality event we still can no longer interpret the profile because under current protocols the mixture is now too complex." *Id*.

Contrary to Davis's claim, no one from the DPS Crime Lab has stated that the Lab "retracted its findings in the case[.]" Mot.55. Instead, Davis points to his post-conviction DNA expert Dr. Hampikian's statement that DPS "retracted its conclusions regarding this crucial DNA evidence[.]" Mot.57; ROA.24425. But the evidence only shows that DPS was not able to reanalyze the data in 2017. *See* ROA.2468. The testimony

on resentencing in 2011—that Davis could not be excluded as a contributor to the mixture—was not recanted. While the State dismissed the criminal action against Davis, it was not because the State no longer believed that he committed the crime. Indeed, the State's Motion to Dismiss expressly states that charge was dismissed because: "Testimony of accomplice cannot be corroborated because DNA cannot be reinterpreted for use at trial." ROA.2046 (Respondent's Second Amended Answer (citing sealed exhibit *PX-7, Motion to Dismiss* (ECF No. 40-24 at 1))).[20] Because Davis cannot establish a *Giglio/Napue* violation based on false testimony at trial, the district court's conclusion was not debatable.

Davis argues that his claim is not a *Giglio/Napue* false testimony claim, but a *Johnson* claim.[21] Mot.57. He claims that "this false evidence

---

[20]     This sealed exhibit is presumably contained in the Court's Record on Appeal. *See* ROA.7–8.

[21]     The Director maintains that Davis did not raise a *Johnson* claim. While his federal habeas petition cites *Johnson*, he framed this claim as a standard false testimony claim. ROA.473–77. His headings followed the rubric of the *Napue* false evidence standard, *see Reed v. Quarterman*, 504 F.3d at 473, which argued under successive headings: "(F) The State Presented False Evidence Regarding Whether DNA Evidence Connected Davis to the Stocking Cap Left at the Crime Scene of Keith Blaylock's Murder," ROA.473, "(G) The State is Imputed Knowledge of the Falsity of the Testimony," ROA.474, and "(H) The False Testimony Presented by the State was Material." ROA.475. Because the claim was framed the same way in his state habeas application, any *Johnson* claim is unexhausted and procedurally barred. *See* Part III.C, *supra*.

and testimony had a substantial impact on the trial outcome." Mot.58. The district court held that Davis had not shown that the evidence was false or material. ROA.2468. This conclusion is not debatable.

First, *Johnson* does not apply to Davis's case. Davis does not contend that an invalid conviction was entered against him. *See Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir. 2000) ("The present case does not parallel the situation addressed in *Johnson* nor the vast majority of cases that have relied upon *Johnson* [. . .] Instead of a materially inaccurate criminal conviction, we confront purportedly materially inaccurate testimony."). Davis fails to identify a case where the Supreme Court granted *Johnson* relief in a situation like his. Thus, either *Teague* bars relief (if the claim is defaulted) or the CCA could not have unreasonably applied clearly established federal law by denying relief (if the claim was adjudicated on the merits). 28 U.S.C. § 2254(d); *see White v. Woodall*, 572 U.S. 415, 427 (2014).

Davis claims that in *Tuggle v. Netherland*, 516 U.S. 10 (1995) (per curiam), the Supreme Court "applied *Johnson* to the *Ake* [*v. Oklahoma*, 470 U.S. 68 (1985)] error, showing that *Johnson* is not limited merely to invalid conviction evidence, but rather to any 'materially inaccurate

evidence.'" Mot.62–63. During Tuggle's sentencing hearing, a psychiatrist for the Commonwealth testified that Tuggle demonstrated "a high probability of future dangerousness." *Tuggle*, 516 U.S. at 11. The jury found that the Commonwealth established future dangerousness and vileness, the two statutory aggravators, and sentenced Tuggle to death. *Id.* at 11–12. The Supreme Court vacated the judgment based on *Ake* error because Tuggle was denied the assistance of his own independent psychiatrist and remanded for further consideration. *Id.* at 12. On remand, the state supreme court invalidated the future dangerousness finding but reaffirmed the death sentence based on the vileness aggravator. *Id.* The Supreme Court reversed and held that there was not sufficient support to uphold the death sentence because Tuggle was prevented from developing his own psychiatric evidence and was unable to enhance his defense in mitigation. *Id.* at 13. The Supreme Court stated that a proposition that "the existence of a valid aggravator always excuses a constitutional error in the admission or exclusion of evidence" is more akin to *Johnson* than *Zant v. Stephens*, 462 U.S. 862 (1983). *Id.* at 14. However, the Court held that because the court of appeals "misapplied *Zant* in this case, its judgment must be vacated." *Id.*

at 14. It did not grant *Johnson* relief based on unrebutted psychiatric testimony. *See id.*

Second, even expanding *Johnson* beyond its initial confines, Davis cannot show that any materially inaccurate testimony was used against him. As the *Johnson* Court stated, Johnson's prior conviction was invalid when it was entered and was invalid at the time of trial. *Johnson*, 486 U.S. at 585 n.6. Here, Davis's allegation is that DPS no longer stands behind its DNA analysis due to changes in standards and an inability to retest, not that DPS lied or misapplied the standards at the time. Mot.54–57; *see* ROA.24462–67.

Moreover, the *Johnson* Court indicated that the result may have been different if additional evidence had supported the facts of the prior assault. *See Hughes v. Quarterman*, 530 F.3d 336, 346 (5th Cir. 2008) (rejecting *Johnson* claim in part because other evidence connected petitioner to the later reversed conviction). Here, Cason also provided testimony related to the extraneous murder. *See* Factual Background, Part III.A, *supra*. And Orchid Cellmark's testing confirmed that Davis could not be excluded as a contributor to the DNA on the stocking. ROA.21068 (-07 State Habeas Court Findings of Fact and Conclusions of

Law #151); ROA.19945 (-07 state habeas application). Here, Davis is merely offering evidence that potentially conflicts with or undermines the State's evidence that he killed the victim. *See Kelly v. Cockrell*, 72 F. App'x 67, 76 (5th Cir. 2003) (denying *Johnson* claim because, *inter alia*, evidence conflicted); *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996) (distinguishing *Johnson* because the petitioner's claim raised only a question "over what weight the jury should have accorded" an expert witness's testimony).

Davis argues that to obtain a COA, he need only establish that reasonable jurists could debate whether harmful *Johnson* error exists in this case.[22] Mot.58. But the district court did not conduct a harmless error analysis because it held that the evidence was not false or material. ROA.2468–70. Even assuming some trial testimony was false, any resulting error was harmless. *See Velez v. State*, AP-76,051, 2012 WL 2130890, at *32 (Tex. Crim. App. June 13, 2012) (for *Johnson* claims, "a

---

[22] Davis specifically argued in his -09 state writ that "[t]he second prong in a false-testimony claim is materiality, not harm." ROA.21563. Thus, his argument in the district court that the error was harmless under *Johnson* is unexhausted and procedurally barred. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (finding claim unexhausted where the petitioner argued a different standard of assessing harm in state and federal court).

reviewing court 'must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.'"); *see also Clemons v. Mississippi*, 494 U.S. 738, 754 (1990) (harmless error analysis permissible for capital sentencing); *Hogue v. Johnson*, 131 F.3d 466, 502 (5th Cir. 1997) ("[*Johnson*] does not preclude harmless error analysis").

A crucial problem in *Johnson* was that the lower court "refused to reweigh the remaining, untainted aggravating circumstances against the mitigating circumstances." *Romano v. Oklahoma*, 512 U.S. 1, 11 (1994). Here, the result of such an analysis is clear—Davis shows no harm. Again, Davis's role in the murder was supported by the testimony of Cason in addition to the DNA results from the State and Orchid Cellmark. Factual Background, Part III.A., *supra*. And, as amply explained in the district court's opinion, Davis cannot show that any false testimony had a material effect on the sentencing in light of the heinous facts of the crime of conviction, Davis's juvenile history, adult criminal history, gang membership, multiple prison violations, and history of violence including assaults, unprovoked attacks, robbery, and attempted capital murder. ROA.2469–70.

Davis has not shown that reasonable jurists would debate the district court's rejection of this procedurally defaulted and meritless claim. A COA should be denied.

## CONCLUSION

The Director requests that Davis's motion for a COA be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

s/ Jacey Winget
JACEY WINGET
Assistant Attorney General
Texas Bar No. 24125680
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Fax: (512) 320-8132
Email: jacey.winget@oag.texas.gov

*Attorneys for Respondent–Appellee*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I do hereby certify that this brief complies with Fed. R. App. Proc. 32(a)(7) in that it contains 12,991 words, Microsoft Word 2010, Century Schoolbook, 14 points.

s/ Jacey Winget
JACEY WINGET
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS

I do hereby certify that: (1) all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus-scanning program and is free of viruses.

s/ Jacey Winget
JACEY WINGET
Assistant Attorney General

# CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing (ECF) system of the Court. The ECF system sent a "Notice of Electronic Filing" (NEF) to Davis's counsel of record, who consented in writing to accept the NEF as service of this document by electronic means: Kenneth W. McGuire.

s/ Jacey Winget
JACEY WINGET
Assistant Attorney General
